UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN NEWTON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:11-cv-00124-JAW |
| | ) | |
| PAUL LEPAGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER

Under clear United States Supreme Court precedent, when the government speaks, it is not subject to the Free Speech Clause of the First Amendment.[1]  This principle applies to elected state leaders; they have the right to decide what to say and what not to say, and by extension during their term in office, they are authorized to decide what the state of Maine says or does not say about itself.  State of Maine Governor Paul LePage's removal of a mural from the walls of a state office because he disagreed with its contents may strike some as state censorship; instead, it is a constitutionally permissible exercise of gubernatorial authority.  Though his action provoked a storm of constitutionally-protected speech with a stark division between those who applauded his decision as rebalancing the state of Maine's message to the business community and those who condemned his action as muzzling opposing viewpoints, the resolution of this vigorous debate must not rest

---

[1] Government speech remains restrained by the Establishment Clause of the First Amendment. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 130 S. Ct. 1125, 1131-32 (2009).  This case does not raise Establishment Clause implications, and nothing in this opinion deals with the nature of the Establishment Clause's restraint on government speech.

with judicial authority of a federal court.  It must rest instead with the ultimate authority of the people of the state of Maine to choose their leaders.

## I.   STATEMENT OF FACTS

### A.   Procedural History

On April 1, 2011, John Newton, Donald Berry, Jonathan Beal, Joan Braun, Natasha Mayers, and Robert Shetterly (Plaintiffs) filed a complaint against Paul LePage in his capacity as Governor of Maine, Laura Boyette in her capacity as Acting Commissioner of the Maine Department of Labor, and Joseph Phillips in his capacity as Director of the Maine State Museum (Defendants).  *Compl.* (Docket # 1). The Complaint alleges a breach of fiduciary duties, a violation of the Maine Administrative Procedure Act, and a violation of the First Amendment to the United States Constitution stemming from the Defendants' removal of a mural depicting Maine's labor history (the mural) from the lobby of the Maine Department of Labor (MDOL).  *Id.*  The Plaintiffs seek injunctive relief and monetary damages. *Id.*  On April 8, 2011, the Plaintiffs filed an amended complaint adding an allegation that the Defendants violated the Plaintiffs' procedural Due Process rights. *First. Am. Compl.* (Docket # 8).

That same day, the Plaintiffs moved for a temporary restraining order (TRO). *Pls.' Mot for TRO* (Docket # 9) (*Pls.' Mot*).  They requested the Court direct the Defendants to

> (1) reveal the location of the Mural to the Court and to the Plaintiffs,
> (2) instruct the person presently in possession or control of the Mural
> to take all steps necessary to preserve and protect the Mural, to assess
> the present condition of the Mural, and to report the condition of the

Mural to the Court and to the Plaintiffs, and (3) take all reasonable steps, consistent with the Court's findings and orders, to return the Mural to public exhibit at its permanent location in the MDOL.

*Pls.' Mot.* at 20.  The Defendants responded in opposition to the motion on April 11, 2011.  *State Defs.' Objection to Mot. for TRO* (Docket # 12) (*Defs.' Resp.*)  On April 11, 2011, the Court held a telephone conference with the parties in which it granted the Plaintiffs leave to file a reply and the Defendants leave to file a sur-reply.  It also scheduled a hearing on the TRO for April 19, 2011.  On April 13, 2011, the Plaintiffs filed their reply to the Defendants' objection.  *Pls.' Reply to Defs.' Objection to Mot for a TRO* (Docket # 18) (*Pls.' Reply*).  On April 15, 2011, the Defendants filed their sur-reply.  *State Defs.' Surreply in Opp'n to Mot. for a TRO* (Docket # 22) (*Defs.' Sur-reply*).  The Court held oral argument as scheduled on April 19, 2011.

### B.   The Parties' Contentions

### 1.   The Plaintiffs' Motion

The Plaintiffs' premise their request for a TRO exclusively on the Defendants' alleged First Amendment violations.  *Pls.' Mot.* at 4.  The Plaintiffs argue that a TRO is appropriate because their First Amendment action is likely to succeed on its merits.  *Id.* at 5.  They assert that the mural is an "expressive work shielded by the First Amendment," citing case law indicating that paintings, music, literary verse, and non-verbal actions are entitled to First Amendment protection *Id.* at 5-6.  They contend that the mural's depiction of historical images of Maine's labor history "is a

nonverbal but nonetheless effective way to communicate ideas to the public." *Id.* at 6.

The Plaintiffs further argue that the removal of the mural from the MDOL lobby infringes their First Amendment right to receive ideas expressed by the mural. *Id.* They assert that the First Amendment "necessarily protects not only the source's right to expression, but also the recipient's corollary right to receive information and ideas." *Id.* at 6-7. They quote the United States Supreme Court's statement that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Id.* at 7-8 (quoting *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982)).

The Plaintiffs focus on the Defendants' reasons for removing the mural. They assert that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," and reason that the removal of the mural was a First Amendment violation because it was based on the content and viewpoint of the mural. *Id.* at 8 (quoting *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). They argue that content-based restrictions are presumptively invalid and subject to strict scrutiny, and that "[w]ithin the realm of content-based restrictions," viewpoint restrictions are subject to "the most exacting scrutiny." *Id.* at 9. The Plaintiffs contend that "[d]ue to the particularly egregious nature of viewpoint discrimination," the Supreme Court has prohibited government restrictions on

viewpoint regardless of the forum in which the speech is prohibited and the strength of the government's interest in restricting speech. *Id.* at 9-10.

Turning specifically to government interaction with artistic expression, the Plaintiffs argue that "content-based restrictions are permissible so long as they are not viewpoint based." *Id.* at 10 (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 572-73 (1998)). They maintain that the Defendants' removal of the Mural was "not only content-based but viewpoint-based." *Id.* at 11. They allege that the Defendants removed the mural "in response to complaints from an anonymous individual who said the mural was propaganda of the Union movement and reminded [them] of murals from communist North Korea used to 'brainwash the masses,' as well as complaints from several unnamed members of the business community." *Id.* The Plaintiffs argue that this justification evinces the Defendants' disagreement with the murals "pro-Union" and "anti-business" views, and that there were "[n]o viewpoint-neutral reasons" to remove the mural from its location in the MDOL lobby. *Id.*

Anticipating the Defendants' response, the Plaintiffs argue that the mural is not "government speech." *Id.* They recognize that the Supreme Court in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 125 S. Ct. 1125 (2009), held that donated monuments for permanent display in a public park constitute "government speech" not subject to the Free Speech Clause. *Id.* But in their memoranda, the Plaintiffs distinguish *Pleasant Grove* on two grounds. First they argue that the artist, Judy Taylor, retained rights in the mural by way of her contract with the

State, thereby retaining a First Amendment interest in the mural and conferring a "private speech" aspect to the expressive work. *Id.* at 12. Second, they argue that "even where expressive works are owned by the government and the government has broad discretion to grant or deny access to that speech, the government nevertheless may not exercise its discretion to suppress speech based purely on narrow partisan political grounds." *Id.* at 12-13.

At oral argument, the Plaintiffs emphasized a third distinction: the "unmistakably understood" factor in *Pleasant Grove*. In *Pleasant Grove*, the Supreme Court wrote that "[t]he City's actions provided a more dramatic form of adoption than the sort of formal endorsement that respondent would demand, unmistakably signifying to all Park visitors that the City intends the monument to speak on its behalf." 129 S. Ct. at 1134. Seeking a standard to measure what a work of art would unmistakably signify, the Plaintiffs turn to Justice Souter's concurrence in *Pleasant Grove* and note that he proposed that "the best approach" would be to ask "whether a reasonable and fully informed observer would understand the expression to be government speech." *Id.* at 1142. Applying these dual standards to the mural, the Plaintiffs argued that a "reasonable and fully informed observer" would not understand that the mural unmistakably signified government speech.

In addition to their success on the merits, the Plaintiffs argue that they have met the other prerequisites for a TRO. They contend that they will suffer irreparable harm unless the Defendants are enjoined since courts have held that

First Amendment violations are irreparable injuries, not adequately compensable by money damages. *Id.* at 16-17. They argue that they have been deprived of an opportunity to "draw ideas and inspiration from the [m]ural," and that this "cannot be compensated through money damages." *Id.* at 17-18. Moreover, they are concerned that the mural is currently being stored in inappropriate conditions, potentially subjecting it to damage that may permanently deprive them of the "opportunity to view the [m]ural in its original state, if at all." *Id.* at 18. In contrast to their irreparable harm, the Plaintiffs assert that the Defendants "will not suffer any hardship by complying with the requirements of the First Amendment," and that restoration of the mural "will merely restore the *status quo ante*." *Id.* at 19. Finally, the Plaintiffs contend that the public interest favors granting a TRO. *Id.* They assert that restoration of the mural would "serve the broad public interest in protecting the First Amendment 'right to receive information and ideas.'" *Id.* (quoting *Pico*, 457 U.S. at 867). Moreover, they argue that restoration of the mural would serve the policy of Maine to "preserve and exhibit the environmental and cultural richness of the State," to "further the cultural and educational interests of the people of the State," and to present Maine's "proud heritage and unique historical background." *Id.* at 19-20 (quoting 27 M.R.S. § 81).

## 2.    The Defendants' Response

The Defendants first respond that the Plaintiffs lack standing to bring this case. *Def's' Resp.* at 3. Noting that the "traditional role of Anglo-American courts" is "to redress or prevent actual or imminently threatened injury caused by private

or official violation of law," the Defendants say that this Court has "no charter to review and revise legislative and executive action." *Id.* (quoting *Arizona Christian Schs. Tuition Org. v. Winn*, Nos. 09-987, 09-991, 2011 U.S. LEXIS 2612 (Apr. 4, 2011)). To demonstrate standing, the Defendants say, the Plaintiffs must show "injury in fact," "a causal connection between the injury and the conduct complained of," and a conclusion that it is "'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Observing that the Plaintiffs claim nothing more than that "they are citizens of Maine who have viewed the mural in the past and intend to view the mural again," the Defendants say that this is precisely the type of standing the Supreme Court rejected in *Lujan.* *Id.* at 4. The Defendants conclude that "[a]s members of the general public, [the Plaintiffs] have no standing to inspect the government-owned mural under the First Amendment." *Id.*

The Defendants next respond that the First Amendment does not apply to the Mural because it is government speech. *Defs.' Resp.* at 5. They assert that both the previous administration's commissioning and the current administration's removal of the mural were government speech. *Id.* They contend the sole difference between the commissioning and the removal is the Plaintiffs' personal approval of the former and disapproval of the latter. *Id.* They say that to subject such speech to the First Amendment would make a prior administration's speech "fixed and unalterable," a proposition they argue is "clearly at odds with both common sense and Supreme Court precedent." *Id.* at 6. They argue that all the cases cited by

Plaintiffs for the proposition that the government cannot speak as it wishes through the exhibition or non-exhibition of art were handed down before *Pleasant Grove*. *Id.* at 7. The Defendants further disagree that the artist retained a sufficient legal interest in the mural to deem it private speech subject to the First Amendment; instead, they say that the artist "relinquished any First Amendment right she may have had upon sale." *Id.* (citing *Serra v. United States Postal Servs. Administration*, 847 F.2d 1045, 1049 (2d Cir. 1988)). They further argue that "[t]here is no authority for the proposition that the First Amendment demands that these Plaintiffs be informed of the mural's whereabouts or be allowed to inspect it." *Id.* at 8.

Turning to the other prerequisites for a TRO, the Defendants argue that the Plaintiffs will not be irreparably harmed if a TRO is not granted. *Id.* at 8. They reiterate their view that the Plaintiffs have no interest in the mural and assert that "[i]n any event, [the Plaintiffs'] inability to look at the mural until the litigation is resolved or the mural is placed at a different location is at most a temporary inconvenience and certainly cannot be viewed as 'irreparable harm.'" *Id.* Moreover, they contend that the Plaintiffs' allegations that the mural has been damaged or is being improperly stored are "conjecture." *Id.* They argue that the harm to the state "would be to have a federal court issue a mandatory order against them, and in doing so decide political issues by directing government speech in violation of the Constitution." *Id.* at 9. Finally, they argue that the public interest weighs against

issuing a TRO because this is a political issue and "[t]he Constitution mandates that it be resolved in the political arena, not the judicial one." *Id.*

### C.  The Plaintiffs' Reply

The Plaintiffs insist they have standing to assert a violation of their First Amendment rights.  *Pls' Reply* at 1.  They reiterate their "right to 'receive information and ideas,'" *id.* (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 756-57 (1976)), and that the removal of the mural violates that right, causing the Plaintiffs "concrete and particularized harm."  *Id.* at 1-2.  They distinguish themselves from the plaintiffs in *Lujan* by noting that Plaintiffs Berry and Newton regularly visit the MDOL for business reasons, so their exposure to the alleged harm is definite and regular.  *Id.* at 2.

The Plaintiffs reiterate that the state's removal of the mural violated their First Amendment rights for three reasons.  First, they say the removal was motivated by the Defendants' "disagreement with the [m]ural's perceived political viewpoint."  *Id.* at 3.  They contend that viewpoint-based restrictions of speech are unconstitutional regardless of the forum in which the restriction takes place.  *Id.* at 3, 9-10.  Second, they argue that even if the mural is government speech, it was unconstitutional to suppress the mural's message based solely on disagreement with its perceived political viewpoint.  *Id.* at 3, 10-11.  Finally, they reassert that the mural is private speech and that the MDOL is a government-owned forum for public discourse.  *Id.* at 3, 5-9, 11-14.  They contend that government restriction of private speech in such a forum is subject to strict scrutiny and that the Defendants'

actions cannot withstand strict scrutiny because the removal of the mural is not narrowly tailored to serve any compelling state interest.  *Id.* at 3, 11-14.

### D.    The Defendants' Sur-Reply

In their sur-reply, the Defendants dispute the Plaintiffs' assertion that they have a right to receive ideas and information expressed by artwork owned by the government.  *Defs' Sur-reply* at 1.  They contend that the case the Plaintiffs cite to support the existence of such a right involved government restrictions on private speakers and the right to receive information from those private speakers presupposed their willingness to speak.  *Id.* at 2 (*Virginia State Bd. of Pharmacy*, 425 U.S. at 757).  They argue that the Plaintiffs cannot force an unwilling speaker to speak.  *Id.*  They assert that because there is no such right, there was no injury violating the right and thus the Plaintiffs lack standing.  *Id.* at 1-2.  The Defendants further contend that the Plaintiffs' argument for standing invokes the artist's speech rights.  *Id.*  They observe that she is not a plaintiff and as such the Plaintiffs have no standing to make claims on her behalf.  *Id.* at 2-3.

Next, the Defendants reiterate that the removal of the mural was government speech.  *Id.* at 3, 6-9. They emphasize the government's ownership and control of the mural, from inception to removal, and the government's placement of the mural in the MDOL lobby to support their view that the mural represents the government's own expression.  *Id.* at 6-7.  They say that because it was government speech, the Defendants' actions did not have to be viewpoint neutral.  *Id.* at 5.  They argue that the Plaintiffs' arguments to the contrary rely on distinguishable or

overruled case law. *Id.* at 5-6. The Defendants further contend that the artist did not maintain sufficient contractual rights in the mural for it to be considered her private speech. *Id.* at 9. Assuming forum analysis were to apply, they assert that the MDOL is not a public forum and did not become one by the government's solicitations for and displaying of a single piece of artwork. *Id.* at 11-12. Finally, they contend that the Plaintiffs' arguments are "self-defeating" because "it would *not* be viewpoint-neutral for the State to exhibit forever one artistic perspective on labor." *Id.* at 13-14 (emphasis in original).

## II.   DISCUSSION

### A.   Legal Standard for TRO

To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction. *Northwest Bypass Group v. United States Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 337 (D.N.H. 2006). The movant must demonstrate:

> (1) it will likely succeed on the merits;

> (2) it will suffer irreparable harm if the injunction is denied;

> (3) the harm it will suffer outweighs any harm to [the defendant] that would be caused by injunctive relief; and,

> (4) the effect on the public interest weighs in its favor.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006); *Kelly Servs., Inc. v. Greene*, 535 F. Supp. 2d 180, 183 (D. Me. 2008). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted

unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2948, pp. 129-30 (2d ed. 1995) (emphasis added in opinion)).  To support or oppose a motion for injunctive relief, "the parties must present '[e]vidence that goes beyond the unverified allegations of the pleadings . . . .'" *Kelly Servs.*, 535 F. Supp. 2d at 181, n.1 (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2949 (2d ed. 1995)).  Here, the parties presented affidavits in support of their respective positions.

### B.   Standing

In *Griswold v. Driscoll*, the First Circuit addressed a claim that a decision by the Commissioner of Elementary and Secondary Education of Massachusetts to revise an advisory "curriculum guide" in response to political pressure violated the First Amendment.  616 F.3d 53 (1st Cir. 2010).  In defense, the Commissioner questioned whether the Plaintiffs had standing to raise the First Amendment claim. *Id.* at 56.  The *Griswold* Court observed "the dispositive questions of standing and statement of a cognizable claim are difficult to disentangle."  *Id.*  As the *Griswold* Court described it, if the plaintiffs in *Griswold* stated a First Amendment claim supported by the evidence about the curriculum guide, the "opportunity for a distinct analysis of standing is clear."  *Id.*  At the same time, an "equally straightforward reading is that of a curriculum guide claim that should be treated like one about a library, in which case pleading cognizable injury and stating a

13

cognizable claim resist distinction." *Id.* The First Circuit resolved to "dispose of both standing and merits issues together." *Id.*

That is also the case here. Whether the Plaintiffs are suffering a cognizable injury is entangled with whether they have a First Amendment right to view the mural. Thus, it makes good sense to follow the First Circuit's lead and treat standing and the merits as intertwined. An exception may be the Plaintiffs' standing to assert the continuing contractual rights of the artist, who is not a party to the case, a proposition about which the Court has a healthy degree of skepticism. But as the resolution is the same, the Court will not reach the standing question of whether the Plaintiffs are asserting or could assert First Amendment claims that rely on a third person's contractual rights.

## C.    Likelihood of Success

The "sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 15 (1st Cir. 2004) (citation omitted).

### 1.    The First Amendment

In their motion, the Plaintiffs reiterate seminal principles of free speech that strike at the core of the Bill of Rights and constitutional liberty about which there is no controversy. The Court agrees with the Plaintiffs' general contentions that the First Amendment extends its protection to works of art like the mural, and that the First Amendment includes the right to speak and the right to listen to a willing

speaker—for visual works of art, the right to create and the right to view a willing exhibitor's work.  If this were an action to prevent the state of Maine from entering onto a private museum, for example, and attempting to censor the works of art on the wall, the answer to this motion would be obvious.  No government in this Country can constitutionally do such a thing.

### 2.    The Government Speech Doctrine

This case is not, however, about state regulation of private speech; it is about whether the government itself has a right to speak for itself or in the case of the removal of the mural, the right not to speak:  the so-called government speech doctrine.[2]  The United States Supreme Court has stated in unmistakable language that government speech is different than private speech; in the words of the Supreme Court, "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove*, 555 U.S. 460, 129 S. Ct. at 1129.  The government speech doctrine is neither aberrational nor novel.  In a Court that periodically disagrees with itself on critical issues, the Supreme Court decided *Pleasant Grove* 9-0 with several concurrences.  *Id.*  The *Pleasant Grove* Court cites a number of cases where the doctrine had been mentioned.  *Id.* at 1131 (citing *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny"); *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 139, n.7 (Stewart, J., concurring) ("Government is not restrained by the

---

[2] The Court rejects the Plaintiffs' creative contention that the mural represents private speech for reasons it explains later in the opinion.

First Amendment from controlling its own expression"); *Bd. of Regents of Univ. of Wis. Sys v. Southworth*, 529 U.S. 217, 229 (2000) (stating that a government entity has the right to "speak for itself"); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("[I]t is entitled to say what it wishes" and to select the views that it wants to express); *Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view").

With this said, in 2009, the *Pleasant Grove* Court expanded the contours of the doctrine, and by Supreme Court standards, the doctrine is, as Justice Souter recently wrote, "still at an adolescent stage of imprecision." *Griswold v. Driscoll*, 616 F.3d 53, 59 n.6 (1st Cir. 2010); *Pleasant Grove*, 129 S. Ct. at 1139 (Stevens, J. concurring) (describing it as "recently minted").

### a.   *Pleasant Grove*

In *Pleasant Grove*, the United States Supreme Court considered whether a municipality violated the First Amendment when it prohibited a private group from placing a permanent monument in a city park where other donated monuments had been erected. 129 S. Ct. at 1129.  The private group, a religious organization called Summum, requested permission to erect a stone monument containing "the Seven Aphorisms of SUMMUM" in a Pleasant Grove, Utah public park.  *Id.* at 1130.  The city denied its request.  *Id.*  Pleasant Grove had previously accepted a monument of the Ten Commandments in the same park, and Summum alleged that the city "violated the Free Speech Clause of the First Amendment by accepting the Ten

Commandments monument but rejecting the proposed Seven Aphorisms monument." *Id.*

Observing that the parties fundamentally disagreed about whether the city was engaging in its own expressive conduct or was providing a forum for private speech, the Supreme Court concluded that "the placement of a permanent monument in a public park is best viewed as a form of government speech not subject to scrutiny under the Free Speech Clause." *Id.* at 1129. It articulated the principle that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Id.* at 1131. The Court examined the policies underlying this principle. *Id.* It explained that the government would be unable to function if "every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed." *Id.* If that were the case, political debate would be relegated to the private sector. *Id.*

The *Pleasant Grove* Court did not set forth a specific analysis to determine whether expression is government or private speech, but it hinted at certain relevant factors. First, it observed that "[n]either the Court of Appeals nor respondent disputes the obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech." *Id.* at 1133. The Court also added the concept of permanency. ("Permanent monuments displayed on public property typically represent government speech"). Second, it noted that government speech does not become private speech merely because it "receives assistance from private sources for the

purpose of delivering a government-related message." *Id.* Third, it suggested that the government's involvement in commissioning the work and in how it came to be in public space matters. Explaining why monuments on public property are typically public speech, the Court stated that "[w]hen a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure." *Id.* at 1133. Fourth, the Supreme Court indicated that the location of the work is important because it is "not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated." *Id.* Fifth, a government's ability to reject works is a hallmark of government speech. *Id.* ("Respondent does not claim that the City ever opened up the Park for the placement of whatever permanent monuments might be offered by private donors. Rather, the City has 'effectively controlled' the messages sent by the monument in the Park by exercising 'final approval authority' over their selection"). *Id.* at 1134. Finally, the size of the venue where the work is displayed is a relevant consideration. *Id.* at 1137 ("public parks can accommodate only a limited number of permanent monuments . . . .it is hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form or expression"). Taken together, these considerations suggest that the government's control over speech is the predominant consideration in the government speech analysis. *See also Sutliffe v. Epping*, 584 F.3d 314, 329 1st Cir. 2009) ("plaintiffs' claim fails because the Town

defendants' actions, in setting up and controlling a town website and choosing not to allow the hyperlinks constituted government speech.")  Applying these factors to the facts in this case, the Court concludes that the mural fits well within the conception of government speech in *Pleasant Grove*.

### i.   Permanent Publicly-Financed Monuments on Public Property

The *Pleasant Grove* Court presented a general framework for identifying government speech.   In *Pleasant Grove*, the Supreme Court was addressing the proposed placement of a stone monument in a city park and it remarked that it was obviously government speech because it was a 1) permanent, 2) publicly-financed 3) monument, 4) displayed on 5) public property.  *Id.* at 1130-31.  Here, the Percent for Art contract specified that the "permanent location of the work shall be: Department of Labor, Augusta, Maine."  *First Am. Compl.* Attach. 1 at 12-13 (*Percent for Art Contract*).  Accordingly, the artist, the MDOL, and the Plaintiffs all contend that the mural was intended to be permanent, satisfying one *Pleasant Grove* factor.  The parties also agreed that the mural here was publicly-financed, satisfying the second factor.  There is no controversy about whether the mural had been displayed in the anteroom[3] of the MDOL and therefore the mural meets the

---

[3] Each party sought to gain some definitional advantage in the term used to describe the room in which the mural was located.  The Plaintiffs describe the room as a "lobby;" the Defendants as a "waiting room."  The Court has never visited the MDOL office and has no photographs depicting it; it relies on a description of the room contained in an affidavit submitted by a state employee.  The affidavit says that the MDOL leases a portion of an office building "several miles from the State Capitol in a building that is privately owned."  *Def.'s Sur-reply* Attach. 1 *Aff. of Adam Fisher* ¶ 4.  The office building contains both private and public tenants.  *Id.*  The anteroom is "approximately 125 feet down a corridor from the nearest public entrance" and the corridor is used by those "transacting business with the Department, other state agencies and private entities renting office

fourth and fifth factors. The mural was displayed in the anteroom of the MDOL, which is public property, but not the kind of open forum of a public park.

A final factor is that the work of art in *Pleasant Grove* was a monument; here, the work of art is a mural. The question for this factor becomes whether a mural is like a monument for government speech purposes. The *Pleasant Grove* Court's description of a monument in relation to the concept of government speech is illuminating:

> A monument, by definition, is a structure that is designed as a means of expression. When a government entity arranges for the construction of a monument, it does so because it wishes to convey some thought or instill some feeling in those who see the structure.

129 S. Ct. at 1133. What is significant for government speech is not that the work in *Pleasant Grove* was a monument, but that as a monument, the work of art was "designed as a means of expression" and the government "wishe[d] to convey some thought or instill some feeling in those who see the [work]." The mural here clearly met this criterion.

Moreover, the Complaint asserts that the mural is thirty-six feet, consists of eleven panels, and was designed "specifically to fit into the space in the lobby of the MDOL offices in Augusta." *First Am. Compl.* at ¶¶ 26-27. Visitors to the MDOL

---

space." *Id.* ¶ 5. The room is "approximately 12 feet by 26 feet in size." *Id.* ¶ 9. At one end of the room is a "receptionist behind a security window." *Id.* ¶ 11. Three sides of the room are "lined with nine chairs, and two small tables." *Id.* ¶ 10. During oral argument, the Court questioned Plaintiffs' counsel about this description and they agreed that it was generally accurate.

In light of the details of the description, the Court views "waiting room" as more accurate than "lobby" since the latter term conveys an image of a hotel lobby, a large semi-public reception area connecting the public exterior to the more private interior of a hotel. Nevertheless, rather than quibble about terms, the Court uses the more neutral word, "anteroom", to describe the room where the mural was located.

would not see the mural as one of many pieces of art in the anteroom.  Its size and design characteristics indicate that the mural was intended as a permanent piece of the décor in the MDOL anteroom.  There is no indication that it was a mobile piece of artwork created to travel from location to location like the works of art in the cases cited by the Plaintiffs.  *Pleasant Grove* distinguished permanent monuments from temporary displays of private works.  *See Pleasant Grove*, 129 S. Ct. at 1138 (distinguishing *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) in which a group requested to display "a cross for a period of 16 days on public property that had been opened up for similar temporary displays").  The mural was in the MDOL anteroom for three years, and if the Plaintiffs were successful, it would be there permanently.  Like a monument in a public park, it seems the mural was contemplated as more of a fixture in the MDOL anteroom than as a temporary display of a private work.

The conclusion is that the mural in this case fits easily within the general factor analysis in *Pleasant Grove* and is likely government speech.  This overview analysis does not end the discussion because the *Pleasant Grove* Court also examined other more specific criteria, which test more thoroughly each of these general factors.

### ii.    The Source of the Speech: The Creator and the Funding

The source of the mural was the creative ability of a private, not government artist.  In this Court's view, this does not mean the mural must be private speech.

Just as a monument in a park does not remain private speech because it was carved by a private sculptor, the mural here does not remain private speech because it was painted by a private artist. To rule otherwise would severely constrain the reach of the doctrine only to government artists. Here, the funding for the commission and purchase of the mural was solely governmental, so the question of private funding of a government-related message is not present.

### iii     Governmental Involvement in the Work

It was in 2007 that the Maine Arts Commission (MAC) and the MDOL, both state agencies, issued a request for proposals from the public for a Public Arts project to be placed in the MDOL office in Augusta. *First Am. Compl.* ¶ 23. After Judy Taylor's proposal was accepted, she entered into a contract with the MDOL in which she agreed to create and install a work of art entitled Maine Labor Mural Cycle with specified dimensions made of specific materials consisting of ten panels depicting "selected episodes in the history of Maine labor." *Percent for Art Contract* at 12. Upon final acceptance of the work, "[o]fficial sole ownership" transferred when the MDOL sent Ms. Taylor a letter of final acceptance, which triggered final payment. *Id.* at 13. The MDOL agreed to provide and install an identification plaque, which contained the following information:

> Title of Artwork: The Maine Labor Mural Cycle
> Year: 2007-2008
> Artist: Judy Taylor
> Commissioned for The Department of Labor and the citizens of Maine under the Maine Percent for Art Act administered by the Maine Arts Commission

*Id.* at 14.  Ms. Taylor retained the right to copyright the work but the DOL retained the right to reproduce it for the benefit of the public, and the artist agreed to "give a credit" to the MDOL in any public showing of reproductions of the work by noting: "Originally owned by The Department of Labor and the State of Maine."  *Id.* at 15. The MDOL agreed not to "intentionally destroy or alter the work in any way whatsoever without prior consultation with the [MAC] and the artist."  *Id.*  The MDOL agreed to place the mural "in the location for which it was selected."  *Id.* The contract further provided that "if, for any reason, the work has to be removed or moved to a new location," Ms. Taylor and the MAC had the right to advise or consult with MDOL "regarding the treatment of the work."  *Id.*

Here, the Court concludes that the state of Maine's involvement in this mural was and continues to be substantial.  The state originated the idea for the mural; it commissioned the work; it chose the subject of the mural; it selected its original location; it chose the artist; it paid for it; it owns it; it retains the right to move it or even destroy it.

### iv.    The Location of the Work and the Message

Until recently, the mural was located in an anteroom in the MDOL.  The state chose the location of the work and the state awarded the commission to Ms. Taylor to depict the history of the Maine labor movement, a theme consistent with the mission of the MDOL.  If the state had commissioned a work of art that depicted the beauty of the Maine coast, a visitor might well conclude that the message was personal to the artist.  Here, however, because the mission of the MDOL coincided

23

with the theme of the state-commissioned mural, the visitor is more likely to view the mural as an expression of a government point of view about organized labor.

### v.    Government Exclusion

The Percent for Art contract alludes to a DOL solicitation for proposals for the artwork; however, the parties did not provide the Court with the solicitation itself, which could help answer the extent to which the state narrowed the topic of the artwork to the history of labor.[4]   It is not clear, therefore, that the state excluded other themes.   What is clear, however, is that "through an advisory selection committee," the MDOL "solicited proposals" and it was the MDOL that awarded Ms. Taylor the commission based on her proposal to depict the history of the labor movement in the state of Maine.   *Percent for Art Contract* at 12.   The artist promised to "create the work in accordance with the approved design" and was allowed to make only "minor changes in the final work as is deemed aesthetically or structurally necessary."   *Id.*   The Percent for Art Contract confirms that the MDOL controlled the process by which the artist and the theme were selected.

### vi.    The Venue

There are a couple of aspects to the venue question.   The first is *Pleasant Grove*'s emphasis on the proposed location of the Summum Church monument as a

---

[4] If the state considered only solicitations that proposed works of art that depicted the history of the labor movement in Maine, this factor would be some evidence that the Government used the solicitation process to express its viewpoint through the work of art.   At the same time if the Government solicitation was more general, this would suggest it had not excluded viewpoints other than the mural.   But the parties did not place the solicitation in evidence so the Court can draw no conclusions on this question.

public park; the second is the size of the monument in relation to the available space.

Regarding public parks, the *Pleasant Grove* Court observed that "[p]ublic parks are often identified in the public mind with the government unit that owns the land." *Pleasant Grove*, 129 S. Ct. at 1133. The Supreme Court noted:

> Government decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture. The monuments that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech.

*Id.* at 1134. But at the same time, the Supreme Court rejected the traditional "forum analysis" for this type of case. *Id.* (stating that "it is obvious that forum analysis is out of place"). Unlike most speech in a public park, such as a political rally, a march, or an address, monuments are permanent fixed expressions of particular ideas, and they "monopolize the use of the land on which they stand and interfere permanently with other uses of public space." *Id.* at 1337. As government space is necessarily limited, if the government were required to treat permanent monuments the way it treats a protest march, government officials would have to "brace themselves for an influx of clutter." *Id.* at 1338 (quoting 499 F.3d at 1175) (McConnell, J., dissenting from the denial of rehearing en banc).

Thus, the forum analysis does not apply to the mural in the anteroom at MDOL. But the *Pleasant Grove* Court's concern about the size of the monument in relation to the size of the public space does. Here, the question becomes whether the mural as a particular view of the history of the labor movement in Maine

effectively crowds out the possible presentation of other views. The Defendants say that the MDOL anteroom is "approximately 12 feet by 26 feet in size." *Def.'s Surreply* Attach. 1 *Aff. of Adam Fisher* ¶ 9. They describe the room as having "a receptionist behind a security window" on one end. *Id.* ¶ 11. The three other sides of the room "are lined with nine chairs, and two small tables. The mural was on two of these sides." *Id.* ¶ 12. The Percent for Art contract stipulates the dimensions of the mural: One wall: 12′ 3/8″ x 6′ 3/4″ Second wall: 12′ 3/8″ x 24′. *Percent for Art Contract* at 12. Fitting the dimensions of the mural into the dimensions of the anteroom, the mural must have covered virtually the entire length of one side of the room—24′ within a 26′ long wall—and more than half the width of another wall—6′3/4″ within a 12′ wide wall. Although the height of the room is not revealed, unless the height was extremely unusual, the mural, which is uniformly 12′ 3/8″ tall, must have covered the walls from floor to ceiling. Based on the limited record, the Court cannot exclude the possibility that the government could present another viewpoint within the limited available unadorned wall space in the anteroom if the mural were to remain there. However, the Court does conclude that the viewpoint of the mural would in any case dominate the available public space within the anteroom and "monopolize the use of the [room in] which [it hangs] and interfere permanently with other uses of public space." *Id.* at 1337.

The parties have not presented a depiction of the mural as it looked in the anteroom before its removal. However, they have presented enough facts to convey a sense of the scale of the mural in relation to the dimensions of the room.

Accordingly, like a public park, the MDOL anteroom did not have the capacity to accommodate works expressing every viewpoint.  Taking these facts together, it appears that the State conceived of and selected the mural for display on publicly-controlled property as a means of expressing its own message.

### b.    Summary: The *Pleasant Grove* Factors

Applying the general and more specific factors in *Pleasant Grove* to the facts in this case, the Court readily concludes that the mural in the MDOL anteroom fits within the concept of government speech.

### 3.    The Plaintiffs' Specific Contentions

The Plaintiffs have raised certain contentions that they say distinguish this case from the *Pleasant Grove* analysis and requires a different result.

### a.    Monuments and Murals

The Plaintiffs argue that paintings in public spaces should not be subject to the same analysis as the monuments in public parks.  They assert that monuments have a "long history . . . on public land as expressions of government speech."  *Pls' Reply* at 6.  They contend that the history of display of artwork in public places is quite different.  *Id.* at 7.  Specifically, they argue that "there is an equally long tradition of governments opening up publicly owned spaces for exhibition of art by private speakers."  *Id.* (emphasis in original).  As such, they maintain that visitors to the MDOL would reasonably identify the mural as the expression of a private citizen.

In support, they cite case law where courts concluded that by opening up public space for the display of individual artistic works, the government does not intend to adopt the message of the artists or communicate a government message. *Pls.' Reply* at 7 (citing *Hopper v. Pasco*, 241 F.3d 1067 (9th Cir. 2001); *Henderson v. Murfreesboro*, 960 F. Supp. 1292 (M.D. Tenn. 1997); *Sefick v. Chicago*, 485 F. Supp. 644 (N.D. Ill. 1979)).  This Court has no quarrel with any of these cases but they are easily distinguishable: they all involve work not paid for by the government, owned by the artist, and on temporary display in government space.  Thus, they are much more like a public protest in a public park than the mural in this case.  In *Hopper*, in a program administered by a private organization, the city invited local artists to display their works for three months in the public hallways of the city hall in hopes that passersby would purchase the works from the artists.  *Hopper*, 241 F.3d at 1070-72.  In *Henderson*, the Court addressed a complaint about a painting of a partially nude woman exhibited by the artist in the rotunda of the state capitol building.[5]  960 F. Supp. at 1294-95.  In *Sefick*, the artist was scheduled to present sculpted figures in tableau for a period of three weeks, and one of his tableaus satirized the current mayor; hardly a situation where the viewer might conclude the work represented government speech.  *Hopper*, 485 F. Supp. at 646-48.  In these cases, there is no suggestion that anyone could have reasonably confused the controversial works of art with government speech.  Moreover, even if courts have held that certain private paintings displayed on government land were not

---

[5] The *Henderson* Court does not directly describe how long the artwork was to be displayed but based on the Court's description of the exhibition program, this Court infers that the individual works of art were not on permanent display.

government speech, it does not follow that no painting displayed on government land can be government speech.

Moreover, the Plaintiffs make too much of the differences in media. Courts have found that government speech exists in myriad forms. *Sutliffe v. Epping School District*, 485 F. 3d at 329 (Town's choice of hyperlinks on town website found to be government speech); *Illinois Dunelsand Preservation Society v. Illinois Department of Natural Resources*, 584 F.3d 719, 724-25 (Informational pamphlets on government-owned rack in public park found to be government speech); *Johanns v. Livestock Marketing Ass'n* , 544 U.S. 550, 562 (2005) (selection of language for joint public-private advertisement of beef products found to be government speech). What matters is not the medium used but the communicative characteristics of the speech. The Court finds that the mural played a similar communicative role as that attributed to monuments in *Pleasant Grove*. *See supra* Section II.C.1.a.i (explaining that the mural meets the criteria of a monument as defined in *Pleasant Grove*).

> **b.    The Artist's Contractual Rights and Government Speech**

Plaintiffs argue that the mural is private speech because the artist maintained contractual rights in it. For this argument, the Plaintiffs rely principally on *Serra v. United States General Services Administration*, 847 F.2d 1045, 1049 (2nd Cir. 1988). In *Serra*, the General Services Administration (GSA) had approved the removal of "Tilted Arch", an outdoor sculpture in Federal Plaza in New York City, after the work had become the subject of "intense public criticism"

about "the sculpture's appearance and its obstruction of Federal Plaza's previously open space." *Id.* at 1047. The artist sued GSA on multiple grounds, including a First Amendment claim. The *Serra* Court observed among other things that "Serra relinquished his own speech rights in the sculpture when he voluntarily sold it to GSA; if he wished to retain some degree of control as to the duration and location of the display of his work, he had the opportunity to bargain for such rights in making the contract for sale of his work." *Id.* at 1049. Pointing to provisions in the Percent for Art contract, the Plaintiffs claim that Ms. Taylor retained sufficient control over her mural to allow them to maintain a First Amendment claim against the Defendants here.

Preliminarily, the Court is not at all clear that the Plaintiffs, who are not the artist, have standing to assert the artist's contractual rights in this case. However, even if they do, their argument fails. The Second Circuit decided *Serra* in 1988, over two decades before the Supreme Court decided *Pleasant Grove*, and the *Serra* Court, relying on *Board of Education v. Pico*, 457 U.S. 853 (1982), observed that "there are conceivably situations in which the Government's exercise of its discretion . . . could violate the First Amendment rights of the public." *Id.* at 1049. In its clear conclusion that the "Free Speech Clause restricts government regulation of private speech" and does not "regulate government speech", the Supreme Court casts doubt on the continued viability of *Serra*'s premise that the Free Speech Clause of the First Amendment could apply to government speech.

But the Plaintiffs' point is different. It is that Ms. Taylor's continuing contractual rights in the mural make the mural not government speech at all; in effect, placing the mural under *Serra*'s comment that if the artist had wanted to be able to assert First Amendment rights in his sculpture, he should have bargained for them. Here, however, assuming *Serra* is correct on this point, the facts do not support the Plaintiffs' contention that Ms. Taylor retained a set of property rights in the mural that would preclude the application of the government speech doctrine. The Plaintiffs point to the fact that in the Percent for Art contract, the state agreed to identify her as the artist, to give her advance notice and consultation before the destruction, alteration, removal or relocation of the mural, and to allow her to retain the copyright for the mural. *Pls.' Resp.* at 8-9. The Plaintiffs further note that the contract expressly provided that in creating this work, Ms. Taylor was an independent contractor, not a state employee, and that other than generally describing the theme for the work, the state did not control its content.[6] *Id.*

From the Court's viewpoint, the slight contractual strings that Ms. Taylor held on the mural after its sale do not remove the mural from the application of the government speech doctrine. Here, as earlier noted, the state originated the idea of

---

[6] It is possible that the terms of a contract could significantly alter the analysis. For example, assume that the MDOL and Ms. Taylor had contractually agreed that the mural would be displayed with the following caveat prominently displayed:

> The contents of this mural represent the views and opinions solely of Judy Taylor, the artist, and do not represent the views and opinions of the MDOL or the state of Maine.

Whether in the context of this case, this type of disclaimer would have been sufficient to alert the viewer that MDOL was not claiming ownership of the speech remains to be seen, but no such disclaimer has been made in this case.

the work, dictated its theme, commissioned its creation, paid for it, owns it, displays it on its property, and has the right even to destroy it.  The artist's ongoing legal rights, such as they are, are for the most part for prior consultation, not veto power. Thus, if the MDOL decided to burn the mural, it would only have to consult with Ms. Taylor before doing so, and if she protested and protested vehemently, it would not matter contractually.  Even accepting the Plaintiffs' premise that some contractual retention of ownership rights would amount to a matter of constitutional and not contractual law, the minimal rights Ms. Taylor retained in this mural (and has not asserted here) do not foreclose the application of the government speech doctrine.

More to the point, even if Ms. Taylor had continued to own the mural, it may not make a difference.  In *American Atheists, Inc. v. Davenport*, a post-*Pleasant Grove* decision, the Tenth Circuit suggested that ownership does not alter the government speech analysis.  No. 08-4061, 2010 WL 5151630, at *14 (10th Cir. Dec. 20, 2010).  They noted that the Supreme Court stated in *Pleasant Grove* that the city had "taken ownership of 'most of the monuments in the Park.'"  *Id.* (quoting *Pleasant Grove*, 129 S. Ct. at 1134.).  According to the Tenth Circuit, the Court's use of the word "most" left open the possibility that there were other monuments in the park not owned by the City.  *Id.*  The Tenth Circuit stated that the Supreme Court "strongly implied" that even those monuments not owned by the City were government speech.  *Id.*  Concluding that ownership did not alter the government speech analysis, the *American Atheists* Court held that crosses placed on state land

32

by a private organization were government speech even though the private organization maintained full ownership of the crosses.  *Id.* at 11-14.

### c.    "Unmistakably Signifying"

At the TRO hearing, the Plaintiffs raised another point, seeking to take this mural outside the scope of the government speech doctrine.  They argued that *Pleasant Grove* suggests that to be considered government speech, the speech must "unmistakably" come from the government.  As support they quoted Justice Alito's statement in *Pleasant Grove* that the city's taking ownership of a monument and putting it on permanent display in a park "unmistakably signif[ied] to all Park visitors that the City intend[ed] the monument to speak on its behalf." 129 S. Ct. at 1134-35.  The Plaintiffs contend that a person viewing this mural in the MDOL anteroom could not come to the conclusion that its contents "unmistakably signify[]" government speech.

First, the Court is not certain that the "unmistakably signify[]" language represents a legal standard.  This language responded to the *Pleasant Grove* plaintiffs' contention that a privately donated monument should not be government speech unless a government entity goes "through a formal process of adopting a resolution publicly embracing the message that the monument conveys." *Id.* at 1134.  Justice Alito disagreed, in effect stating that such a formal process was unnecessary because the government's ownership and display of a monument in that case "unmistakably" conveyed the message that the monument was speaking for the government.  In doing so, he was simply pointing out that in that case it was

not difficult "to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Id.* at 1132. From the Court's perspective, Justice Alito did not use "unmistakably" to create a minimum standard for the government speech doctrine to apply. Instead, he was responding to a party's contention that the government speech doctrine did not apply to the monument in that case, where in Justice Alito's view, it clearly did.

The Plaintiffs also argued that the Court should apply a "reasonableness" standard in determining whether the artwork in this case is government speech. They contended that Justice Souter adopted such a standard in his *Pleasant Grove* concurrence. There, Justice Souter wrote,

> To avoid relying on a *per se* rule to say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land.

*Id.* at 1142. The Court views Justice Souter's approach as useful but not binding. First, Justice Souter wrote in a concurrence, not joined by any of the other justices, so there is no binding authority to his suggested approach. Second, when later writing for the First Circuit in *Griswold*, Justice Souter did not apply his own suggested standard and instead observed that the government speech doctrine "is still in an adolescent stage of imprecision." 616 F.3d at 59 n.6 (declining to decide whether the speech at issue was government speech).

Finally, it seems clear that neither Justice Alito nor Justice Souter intended the viewpoint of the observer to trump other factors in determining whether an item

is government speech. *Pleasant Grove* itself describes a number of factors, including whether the government excluded other views, paid for the work, and was otherwise involved in the message, that would not be apparent in most cases by a casual or even sophisticated observer.

Nevertheless, accepting that the way a work of art strikes a member of the public is at least a proper factor under the government speech test, the Court is not convinced based on the limited facts before it that a member of the public who entered the MDOL anteroom, viewed this mural, and read the accompanying description would not come to the conclusion that MDOL commissioned and erected this mural in its anteroom because it reflected MDOL's viewpoint.

### d.    Government Speech and Viewpoint Neutrality

The Plaintiffs argue that even if the mural is government speech, "the government cannot exercise [its] discretion to make viewpoint-based restrictions on that speech." *Pls.' Reply* at 10.   This contention is counter to the holdings in *Pleasant Grove* and subsequent government speech cases.   The Supreme Court has plainly said that where the government is engaging in its own expressive conduct, "the Free Speech Clause has no application."   129 S. Ct. at 1131 (citing Justice Scalia's concurrence in *National Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) stating that "It is the very business of government to favor and disfavor points of view").   That statement alone leaves no room for the Plaintiffs' idea that a viewpoint analysis under the Free Speech Clause applies to government speech.

Yet the Court went further.  It explained that the government could not be expected to be viewpoint neutral in its selection of expressive works because it could not be expected to represent every possible viewpoint.  The Court stated that "[i]f government entities maintain viewpoint neutrality in their selection of donated monuments, they must either 'brace themselves for an influx of clutter' or face the pressure to remove longstanding and cherished monuments"  *Id.* at 1138 (quoting *Summum v. Pleasant Grove City*, 499 F.3d 1170, 1175 (10th Cir. 2007)).  As an illustrative example, the Court stated that the United States did not have to accept a "Statue of Autocracy" to counterbalance the viewpoint expressed by the Statue of Liberty.  *Id.*

Consistent with the Supreme Court's guidance, the First Circuit has implicitly rejected the idea that government speech must be viewpoint neutral.  *Griswold* presented a similar case of a government rejecting certain speech on the basis of its viewpoint.  There, the Commissioner of Elementary and Secondary Education of Massachusetts (the Commissioner) revised an advisory "curriculum guide" (the guide) in response to pressure from political groups to alter references to "Armenian genocide" and general relations between the Ottoman Empire's Turkish majority and Armenian minority populations in the late nineteenth and early twentieth centuries.  616 F.3d at 54-55.  The Assembly of Turkish American Associations brought suit under 42 U.S.C. § 1983 alleging viewpoint discrimination.  *Id.* at 55-56.  The district court "held that the Guide was a form of government speech and, as such exempt from First Amendment scrutiny."  *Id.* at 56.  The First

Circuit generally agreed.  *Id.* ("We affirm the district court, although our reasoning differs slightly at times").  It first distinguished *Pico*, which is similarly relied on by Plaintiffs here, by noting that the plurality's opinion there was unique to "library protection."  *Id.* at 56-57.  Moreover, the *Griswold* Court noted that the plurality in *Pico* intended to reserve "curricular autonomy free of review by a court for viewpoint discrimination."  *Id.* at 58.  Accordingly, it would not extend *Pico* to encompass the idea that "any compliant response to an expression of political opinion critical of a school library's selection of books would violate a First Amendment right to free enquiry on the part of library patrons."  *Id.* at 58.

While the First Circuit's decision did not rely entirely on the government speech doctrine, it noted that *Pleasant Grove* was one of "three strands of Supreme Court case law" supporting its view.  *Id.*  It stated that *Pleasant Grove* was part of a "developing body of law recognizing the government's authority to choose viewpoints when the government itself is speaking."  *Id.* at 58-59.  The *Griswold* Court decided that it did not have to decide definitively whether the guide was government speech to resolve the case.  *Id.* at 59 n.6.  But it noted that its decision "against extending *Pico*" was consistent with the Ninth and Fifth Circuits, both of which "viewed the speech at issue as government speech."  *Id.* (citing *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) and *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000)).  The First Circuit thus made two relevant proclamations in *Griswold*: it construed *Pleasant Grove* as holding that government speech is free to

select its own viewpoint and found that *Pico* does not readily apply to free speech cases outside of the library context.

At the TRO hearing, the Plaintiffs sought to distinguish *Griswold* on the grounds that it involved the Commissioner's removal of his own speech from the guide. The Court does not view that as a principled distinction. For one, the Court has found that the mural was government speech. Accordingly, just as the government was speaking when it put up the mural, the government was speaking when it took it down. Like in *Griswold*, the originator and the terminator of speech were effectively the same entity. Moreover, the Plaintiffs cite no authority for the idea that viewpoint-neutrality suddenly emerges when the individual terminating government speech is different from the individual who originated it.

Similarly, the Plaintiffs argued that *Griswold* is entirely dicta because the First Circuit established that the underlying action was time-barred before engaging in its First Amendment analysis. This Court disagrees. First, the *Griswold* opinion was handed down by the First Circuit, the appellate court to which this Court owes direct allegiance. Second, the Court further notes that *Griswold*, though a First Circuit opinion, was written by Associate Justice Souter, who was a member of the Supreme Court when *Pleasant Grove* was decided.

In addition to *Pico*, the Plaintiffs rely on *Sutliffe v. Epping*, 584 F.3d 314 (1st Cir. 2009), to support their view that government speech must be viewpoint neutral. *Pls.' Reply* at 11. In *Sutliffe*, the First Circuit held that a town's refusal to add a hyperlink to a private group's website from the official town website constituted

government speech. 584 F.3d at 329. The Plaintiffs argue that the case left open the possibility that government speech could still be subject to viewpoint-neutrality because the First Circuit stated that *Sutliffe* was not a case of viewpoint discrimination. *Pls.' Opp'n* at 11 (citing 584 F.3d at 331). However, as the Defendants assert in their sur-reply, the plaintiffs in *Sutliffe* did assert viewpoint discrimination. *Defs.' Sur-reply* at 5 n.4 (citing 584 F.3d at 324).

Read in context, the First Circuit's recognition that this was not a viewpoint discrimination case does not represent the First Circuit's view that if it were, it would alter the government speech analysis. In characterizing the plaintiffs' viewpoint discrimination allegation, the *Sutliffe* Court noted that the plaintiffs alleged that the town had provided a hyperlink to a private group's website to the exclusion of others. 584 F.3d at 324. However, in explaining that plaintiffs had failed to adequately allege viewpoint discrimination, the *Sutliffe* Court emphasized that the allegedly private group was actually a public event "conducted as part of a statewide program of the state university, which the Town had endorsed and provided financial sponsorship for." *Id.* at 332. The *Sutliffe* Court's emphasis on the public nature of the hyperlink included on the town website seems intended to convey that the hyperlink was government speech not subject to viewpoint-neutrality. The First Circuit also acknowledged that the plaintiffs had failed to identify a viewpoint espoused by the challenged link, *id.* but it seems the purpose of that statement was merely to clarify that the plaintiffs would not have a viewpoint discrimination claim even if the challenged link were private speech.

Finally, as discussed earlier, the Plaintiffs cite *Serra* in support of their position that government speech must be viewpoint neutral. *Pls.' Reply* at 10. But the Second Circuit in *Serra* favorably quoted cases holding that governments can say what they wish when promulgating their own speech. 847 F.2d at 1048-49. It stated that "[t]he purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents." *Id.* at 48 (quoting *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94 139 n.7 (1973)) (internal quotations omitted). However, the Second Circuit also relied on *Pico* to assert that even where the government owns the artwork, "it is still possible that the Government's broad discretion to dispose of its property could be exercised in an impermissibly repressive partisan or political manner." *Id.* at 1050. Moreover, it found that "If Serra had presented any facts to create a genuine issue as to whether [the government] was removing [the artwork] to condemn a political point of view or otherwise to trench upon First Amendment rights, we would require a trial, just as we did in *Pico*." *Id.* at 1051.

The Court does not adopt those statements for several reasons. First, *Serra* is a Second Circuit opinion, not binding on this Court. Second, as explained *supra*, the First Circuit in *Griswold* construed *Pico*'s holding as far more limited than did the Second Circuit. Finally, *Serra*, like *Pico*, came down before *Pleasant Grove, Johanns*, and other government speech cases. Significantly, the First Circuit in *Griswold* cited *Pleasant Grove* as part of "a developing body of law recognizing the

government's authority to choose viewpoints when the government itself is speaking." 616 F.3d at 58-59. It further noted that government speech doctrine "is still at an adolescent stage of imprecision." *Id.* at 59 n.6. *Pico* and *Serra*, having been decided more than twenty years before *Pleasant Grove* and *Griswold*, had the benefit of even less jurisprudence defining the contours of government speech. Indeed, the absence of the phrase "government speech" in both *Serra* and *Pico* suggests that it was not a coherent doctrine at the time those cases were decided. Since subsequent caselaw has stated that government speech need not be viewpoint-neutral, any suggestion to the contrary in *Serra* and *Pico* is unpersuasive.

In sum, the overwhelming weight of authority indicates that government speech may say what it wishes regardless of viewpoint, and the Plaintiffs are not likely to succeed in alleging a Free Speech Clause violation. Since there is unlikely to be any Free Speech Clause violation, the Plaintiffs are similarly unlikely to have standing for failure to state a cognizable injury.

### D. Irreparable Harm

At oral argument, the Court questioned Plaintiffs' counsel as to what made this case so urgent that they required a TRO as opposed to a preliminary injunction. Plaintiffs' counsel responded that the First Amendment implications gave it its urgency. The Court asked whether any of the named Plaintiffs were likely to experience a First Amendment violation in the time it took the Court to issue a ruling on the TRO or would likely do so before the Court issued a more contemplative order on a motion for preliminary injunction. Plaintiffs' counsel

frankly conceded that none of the individual plaintiffs was likely to visit the MDOL within either timeframe and thus would not be likely to suffer a First Amendment violation.  Therefore, it is undisputed that the denial of a TRO is unlikely to cause any "loss of First Amendment freedoms, for even minimal periods of time," as Plaintiffs originally alleged.  *Pls.' Mot.* at 17 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  This alone would justify the denial of the motion for TRO.

More to the point, however, is that the Plaintiffs' sole source of irreparable harm is the violation of their First Amendment rights.  If the removal of the mural were not government speech and were subject to the Free Speech Clause, the Plaintiffs would be correct.  In *Elrod v. Burns,* a case quoted by the Plaintiffs, the United States Supreme Court wrote that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976); *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007) (same).  But since the Court has resolved that the removal of the mural is government speech and not subject to the restrictions of the Free Speech Clause, the Plaintiffs have not presented any alternative basis for irreparable injury and have not satisfied this criterion.

E.   **Balance of Harms**

The Court takes seriously the Defendants' contention that they would be harmed by a federal court issuing a mandatory order regarding a state government's handling of a political issue.  *Defs.' Opp'n* at 9.  On its face, such action confronts fundamental principles of federalism and separation of powers.  *See*

*e.g. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473-74 (1982) (cautioning that the exercise of judicial power to declare acts of the legislative or executive branches unconstitutional, though "a formidable means of vindicating individual rights, when employed unwisely or unnecessarily it is also the ultimate threat to the continued effectiveness of the federal courts in performing that role"); *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 111-13 (1981) (examining principles of federalism and comity underlying historical reluctance for federal courts to enjoin state government actions); *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 635 (1st Cir. 1996) ("Balancing responsibility between federal and state government in a republic that assigns interlocking sovereignty to each often requires federal courts to walk an unsteady tightrope.  From a federal court's perspective, this special sort of judicial funambulism always must proceed in the spirit of cooperative federalism tempered, however, by the need to avoid the pitfalls inherent in blind deference to state autonomy").

Just this past year, the Supreme Court reiterated the principle that "the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the state.  *Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323 (2010) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)).  Even though the political question doctrine is "famously murky," *Doe v. Bush*, 323 F.3d 133, 141 (1st Cir. 2004), it remains true that courts should avoid "undertaking tasks

assigned to the political branches." *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

By contrast to these and other considerations that militate against federal injunctive relief, the Court has discussed its conclusion that the Plaintiffs have demonstrated no cognizable competing harm that would justify the extraordinary relief they are seeking.

### F.    Public Interest

The public interest depends upon individual perspective.   However, what seems clear is that the physical removal of the mural did not remove the mural and its message from the public eye.   Far from it.   The mural, which had previously hung in an obscure corner of a small state anteroom known only to a few, is now center stage in a roiling, vigorous and widely-reported controversy.   The merits of the mural, as a work of art, as a neutral rendition of historical fact, as a biased depiction in support of organized labor, have been publicly aired, debated, and editorialized.   Although it may be counterintuitive, the immediate result of the suppression of this work of art has been the generation of considerable public speech about this work of art.

Nevertheless, the Court acknowledges that for some, the removal of the mural will always be an impermissible governmental suppression of free speech and for others, the removal will always be one administration's rightful rejection of forced political speech from a prior administration.

## III.    CONCLUSION

It is not the business of the federal court to decide what messages the elected leaders of the state of Maine should send about the policies of the state, to tell a prior administration that its own artwork is too slanted to continue to hang on state office walls, to tell the current administration that it must not remove or replace a prior administration's artwork, or to tell a future administration which piece of state art, the new or the old, must stay or go.  The messages from the state-owned works of art are government speech and Maine's political leaders, who are ultimately responsible to the electorate, are entitled to select the views they want to express.

The Court DENIES the Plaintiffs' Motion for TRO (Docket # 9).[7]

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 22nd day of April, 2011

---

[7] The Court discussed with counsel the fact that the motion for TRO was something of a hybrid between a motion for TRO and a motion for preliminary injunction.  The Court will schedule a telephone conference of counsel to discuss where the case should proceed from here.