UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOHN NEWTON, et al.,              )
                                 )
          Plaintiffs,            )
                                 )
     v.                          )          1:11-cv-00124-JAW
                                 )
PAUL LEPAGE, et al.,             )
                                 )
          Defendants.            )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

The resolution of the Governor's decision to remove a state-owned labor mural from the anteroom of the Maine Department of Labor rests not in a court of law but in the court of public opinion.

## I.   STATEMENT OF FACTS

### A.   Procedural History

On April 1, 2011, the Plaintiffs filed a complaint, seeking damages and injunctive and declaratory relief against Maine Governor Paul LePage and members of his administration.  In the Complaint,[1] they alleged that removing a labor history mural from the offices of the Maine Department of Labor (MDOL) violated their First Amendment right to receive information and ideas and the procedural due process requirements of the Fourteenth Amendment of the United States Constitution.  They also alleged a breach of the Maine State Museum's fiduciary duty to protect and preserve historical materials under 27 M.R.S. § 86-A,

---

[1] The operative complaint is the Plaintiffs' Third Amended Complaint (Docket # 37).

and they sought review of the government's action pursuant to Maine Rule of Civil Procedure 80C.

On April 22, 2011, the Court issued an extensive Order denying the Plaintiffs' Motion for Temporary Restraining Order. *Order Denying Pls.' Mot. for TRO* (Docket # 24); *Newton v. LePage*, 789 F. Supp. 2d 172 (D. Me. 2011) (*TRO Order*). On June 16, 2011, the State Defendants returned with a Motion for Summary Judgment. *State Defs.' Mot. for Summ. J.* (Docket # 40) (*State's Mot.*). On July 15, 2011, the Plaintiffs objected. *Pls.' Opp'n to Defs.' Mot. for Summ. J.* (Docket # 44) (*Pls.' Opp'n*). On August 8, 2011, the State Defendants replied. *State Defs.' Reply Mem. in Support of Their Mot. for Summ. J.* (Docket # 58) (*State's Reply*).

With their motion, the State Defendants filed a joint Stipulation, setting forth a number of agreed-upon facts and a separate statement of undisputed material facts. *Stip.* (Docket # 39) (*Stip.*)*; State Defs.' Statements of Undisputed Material Fact* (Docket # 41) (DSMF). On July 15, 2011, the Plaintiffs responded to the State Defendants' Statements of Undisputed Material Fact and filed their own Statement of Additional Material Facts. *Pls.' Resp. to Defs.' Statements of Undisputed Material Fact and Pls.' Statement of Additional Material Facts* (Docket # 45) (PRDSMF; PSAMF). On August 8, 2011, the State Defendants filed a reply to the Plaintiffs' Statement of Additional Material Facts. *State Defs.' Reply to Pls.' Resp. to State Defs.' Statements of Undisputed Material Fact and State Defs.' Resp. to Pls.' Statement of Additional Material Facts* (Docket # 59) (DRPRDSMF)

(DRPSAMF).  On August 22, 2011, the Plaintiffs moved to strike portions of the State Defendants' reply to their statement of additional material facts.  *Pls.' Mot. to Strike* (Docket # 61).  On September 12, 2011, the State Defendants opposed the Plaintiffs' Motion to Strike.  *State Defs.' Opp'n to Pls.' Mot. to Strike* (Docket # 62) (*State's Opp'n to Pls.' Mot. to Strike*).

In October 2011, the Plaintiffs moved to reopen the record for summary judgment.  *Pls.' Mot. to Reopen Record* (Docket # 63); *Pls.' First Am. Mot. to Reopen Record* (Docket # 64) (*Pls.' Am. Mot. to Reopen*).  On November 4, 2011, the Court granted the motion and set a briefing schedule for the submission of memoranda on the relevance, if any, of the new material.  *Order* (Docket # 68).

On November 8, 2011, the Court issued an interim order, requiring the parties to review the state of the record and to prepare to confer with the Court to simplify it.  *Interim Order* at 1 (Docket # 70).  Although the parties had filed a comprehensive joint stipulation of facts, the Plaintiffs had added statements of fact, some of which tracked the stipulated facts, some of which contained nuanced differences from the stipulated facts, and some of which contradicted the stipulated facts.  *Id.* at 2.  The Court explained that the Plaintiffs had "caught the Court in the middle of their own factual dispute" and it did not know whether to accept the stipulated facts over the Plaintiffs' statement of facts or vice versa.  *Id.* at 3.  The Court conferenced with counsel on November 9, 2011 and set deadlines for filing a clean record.  *Minute Entry* (Docket # 71).

On November 22, 2011, the Plaintiffs filed a supplemental response in opposition to the State Defendants' Motion for Summary Judgment and a Revised Statement of Additional Material Facts. *Pls.' Supplemental Br. in Opp'n to Defs.' Mot. for Summ. J.* (Docket # 74) (*Pls.' Supplemental Opp'n*); *Pls.' Revised Statement of Additional Material Facts* (Docket # 75) (PRSAMF). On December 12, 2011, the State Defendants filed a supplemental reply to the Plaintiffs' Response to the Motion for Summary Judgment, replied to their Revised Statement of Additional Material Facts, and posited an additional fact. *State Defs.' Resp. to Pls.' Supplemental Br. in Opp'n to Defs.' Mot for Summ. J.* (Docket # 77) (*State's Supplemental Resp.*); *State Defs.' Reply to Pls.' Revised Statement of Additional Material Facts; Defs.' Additional Facts* (Docket # 76) (DRPRSAMF; DAF). The Plaintiffs did not respond to the State Defendants' additional fact.[2] The Court heard oral argument on March 1, 2012.

## B. The Facts

### 1. The Parties

The Plaintiffs, John Newton, Don Berry, Joan Braun, Natasha Mayers, and Robert Shetterly, are residents of the state of Maine.[3] *Stip.* ¶¶ 1-5. Each plaintiff had viewed the labor history mural painted by Judith Taylor at its location in the

---

[2] Under Local Rule 56(f), "[f]acts contained in a supporting or opposing statement of material facts, if supported by appropriate record citations as required by this rule, shall be deemed admitted unless properly controverted." D. ME. LOC. R. 56(f). The Court has treated this additional fact as admitted. *See* DAF ¶ 134A.

[3] Despite the mandate to "clean up" the record, differences between the Stipulated Facts and the Statements of Material Fact persisted. At oral argument, the Court confirmed the agreement of counsel that the Court should assume the accuracy of the stipulated facts and treat the statements of material fact as supplementary.

MDOL office in Augusta, had been inspired and educated by the mural, and had planned to see the mural again at its Augusta location. *Id.* Plaintiff Don Berry has "appreciated the depictions of the history of the struggles and Maine workers in trying to gain fair treatment and fair compensation for their labor." *Stip.* ¶ 76. The Defendants are Paul LePage, the Governor of the state of Maine, Robert J. Winglass, the Commissioner of the MDOL, and Joseph Phillips, the Director of the Maine State Museum (Museum). *Stip.* ¶¶ 6-8.

### 2.   The Mural:  The MDOL Proposal

In 2007, the gubernatorial administration of John E. Baldacci, through the MDOL, desired to commission a mural for the anteroom to the newly renovated MDOL offices in Augusta. *Stip.* ¶ 9; PRSAMF ¶ 9; DRPRSAMF ¶ 9.[4]  In conjunction with a planned move of the Department into the new offices, the

---

[4] Plaintiffs' paragraph 9A states:

> In conjunction with a planned move of the Department into new offices, the Baldacci Administration considered the creation of a mural as part of the décor.

PRSAMF ¶ 9A.  The State Defendants objected in part on the ground that the paragraph relied on the "worst kind of hearsay."  DRPRSAMF ¶ 9A.  The Plaintiffs rely on a sworn declaration of Charles Scontras, which stated:

> Around 2007, someone told me that the Maine Department of Labor was moving into new offices, and that there was consideration being given to having a mural created as part of the décor.  I said that a mural depicting the sweep of Maine's labor history, from artisan workshops through industrialization, to the development of the global economy, might be a good theme.  I do not recall who I made this comment to.

*Decl. of Charles A. Scontras* ¶ 2 (Docket # 48).  The Plaintiffs also cite the MDOL's Public Art Notification.  *Aff. of Lauren Fensterstock* Attach. 2 *Public Art Notification* (Docket # 51).  The Public Art Notification says that "[t]he Department . . . was determined to commission a mural of labor history for their waiting room and raised funding."  *Id.* at 1.

The State Defendants have a point about the admissibility of what an unnamed person told Mr. Scontras in 2007 about what officials in the MDOL were planning.  But there is no dispute that around 2007, officials within the MDOL decided to embark on the project that resulted in the commissioning, creation, and hanging of the mural.  Accordingly, the Court overrules the State Defendants' objection on the ground that it is only to provide background and is otherwise not contested.  Mr. Scontras's statement about what he told MDOL officials has some foundational problems, but is not hearsay.  Again, the Court will allow it as background.

Baldacci Administration considered the creation of a mural as part of the décor. PSAMF ¶9A; DRPSAMF ¶ 9A.   Officials from the MDOL consulted about the creation of the mural with Charles Scontras, a labor historian who at the time was a volunteer associated with the Bureau of Labor Education at the University of Maine, and Mr. Scontras indicated that a mural depicting the sweep of Maine's labor history, from artisan workshops through industrialization, to the development of the global economy, might be a good theme for the mural.[5]   PRSAMF ¶ 10; DRPRSAMF ¶ 10.

---

[5] The Plaintiffs' paragraphs 10 and 16 assert:

> Officials from the MDOL consulted about creation of the mural with Charles Scontras, a labor historian who at the time was a volunteer associated with the Bureau of Labor Education at the University of Maine. Scontras indicated that a mural depicting the sweep of Maine's labor history, from artisan workshops through industrialization, to the development of the global economy, might be a good theme for the mural.

PRSAMF ¶ 10.

> At the time that Scontras served on the Committee, he was not an employee of the MDOL, the MAC, or any state agency, although he was a volunteer at that time for the Bureau of Labor Education at the University of Maine.

PRSAMF ¶ 16.

The State Defendants objected to paragraph 10 on the ground that the record citation does not support the paragraph.   DRPSAMF ¶ 10.   As Mr. Scontras's sworn declaration supports this contention, *Decl. of Charles A. Scontras* (Docket # 48) (*Scontras Decl.*), the Court overrules this objection.

In addition, the State Defendants objected to the Plaintiffs' characterization in paragraphs 10 and 16 of Mr. Scontras as a volunteer and in paragraph 16 as not an employee, first pointing to Exhibit 1 to their Reply to Additional Statements of Fact, which indicates that on February 1, 2008, the Bureau of Labor Education billed the MDOL $5,000 for Mr. Scontras's consultation services.   DRPRSAMF Attach. 1, *Scontras Invoice*.   The State Defendants also note that Maine law contains many definitions of employee and that while serving on the Committee he was covered as a state employee under some provisions of Maine law.   DRPRSAMF ¶ 16.

The State Defendants' objection provoked the Plaintiffs to file a motion to strike. *Pls.' Mot. to Strike.* In the motion, the Plaintiffs observed that the Scontras Invoice is from one state agency to another and that there is no indication that Mr. Scontras was paid. *Id.* at 1.   Furthermore, they pointed to a sworn declaration from Mr. Scontras in which he stated that when he was contacted about serving on the mural committee, he was not employed by MDOL, the MAC, or any state agency. *Id.* at 1-2; *Supplemental Decl. of Charles Scontras* ¶ 2 (Docket # 49).   He stated that he had worked a quarter-time with the Bureau of Labor at the University of Maine but his paid position there was eliminated

The State did not, at that time, and does not generally, have artists on staff as employees capable of painting the mural. DSMF ¶ 9A; PRDSMF ¶ 9A. The MDOL asked the Maine Arts Commission (MAC), also a state agency, for assistance in putting the project out for proposal to private artists and the MAC assisted the MDOL in doing so. *Stip.* ¶ 10; DSMF ¶ 10A; PRDSMF ¶ 10A. One of the MAC's responsibilities is to assist governmental and private entities in commissioning art. *Stip.* ¶ 11. MAC also oversees the "Percent for Art" program, which generally requires that 1 percent of the construction appropriation of a public building be used "for the purpose of acquiring, transporting and installing works of art"; however, the MDOL mural was not a Percent for Art project because the MDOL office space was leased and not new construction. *Stip.* ¶¶ 12-13, 113. According to the Public Art Notification prepared by Donna McNeil, the Director of the MAC, the MDOL wanted to go through a public process to follow the Percent for Art law.[6] *Stip.* ¶ 14; PRSAMF ¶¶ 14, 18; DRPRSAMF ¶¶ 14, 18; DSMF ¶ 13A; PRDSMF ¶ 13A. The Public Art Notification sets forth the decision of the Committee that chose Ms. Taylor's proposal. DSMF ¶ 13C; PRDSMF ¶ 13C.

---

in July 2002. *Id.* Since July 2002, Mr. Scontras stated, he worked as Historian and Research Associate at the Bureau of Labor, University of Maine at Orono, on a volunteer basis. *Id.*

The Court views all of this as murky. How state agencies bill each other is beyond the Court's ken. However, it strikes the Court as odd that one state agency would bill another $5,000 for work performed by a volunteer. Nevertheless, Mr. Scontras's affidavit and the Bureau of Labor Education invoice, taken together, lead to the conclusion that this is precisely what happened. For purposes of the pending motion, the Court is required to accept the evidence in the light most favorable to the non-movant and it does so here. At the same time, the Court DENIES the Plaintiffs' motion to strike as regards Charles Scontras.

[6] The State Defendants interposed a qualified response, indicating that "Ms. McNeil's affidavit on these points go unrebutted." DRPRSAMF ¶ 18. The Court is unclear about the significance of this qualification but has accepted the Plaintiffs' paragraph as admitted for purposes of the motion.

### 3.    The MDOL Committee

On March 17, 2007, an MDOL Committee held a meeting to discuss commissioning the mural.  *Stip.* ¶ 15.  The Committee, which was listed in the Public Art Notification, was comprised of Laura Fortman, the then Commissioner of the MDOL, Jane Gilbert, the Deputy Commissioner of the MDOL, Leslie Manning, the Deputy Director of the MDOL Bureau of Labor Standards, Charles Scontras, educator and author, and Lauren Fensterstock, Director, Institute of Contemporary Art, Maine College of Art.  PRSAMF ¶ 15; DRPRSAMF ¶ 15; *Stip.* ¶ 16; DSMF ¶ 16A; PRDSMF ¶ 16A.   Donna McNeil, Director of the MAC, provided non-voting assistance to the Committee.  *Stip.* ¶ 17.  At the time that Lauren Fensterstock served on the Committee, she was an employee of the Maine College of Art in Portland, Maine, a private college.  PRSAMF ¶ 17; DRPRSAMF ¶ 17.  On March 17, 2007, Mr. Scontras provided the Committee with a letter addressed to Leslie Manning setting forth "[a] few suggestions regarding the proposed mural for the [MDOL]." *Stip.* ¶ 18.  At the March 17, 2007 meeting, there was a lively discussion about the history of the labor movement in Maine, what should be depicted on the mural, what the tone should be, and what resources the artists should consult.[7]  DSMF ¶ 17A; PRDSMF ¶ 17A.

---

[7] The parties have disagreed about whether the Court should consider evidence from Committee members about what transpired at their meetings.  The Plaintiffs objected to this statement and moved to strike it on the ground that they were not allowed to depose the Committee members.  PRDSMF ¶ 17A.  The Court views this objection as a discovery issue, and if the Plaintiffs believed the state of Maine's position was unsupportable, they should have filed an appropriate motion.  Furthermore, in their statements of material fact, the Plaintiffs themselves proposed statements about the deliberations from the Committee members and the State Defendants objected.  *See* PRSAMF ¶¶ 36-38, 39A-42; DRPRSAMF ¶¶ 36-38, 39A-42.  The Court concludes that the parties should be allowed to place into the record evidence of what they contend transpired at the

### 4.    The "Call for Artists"

Sometime after March 17, 2007, the MAC in conjunction with the MDOL issued a "Call for Artists," a public request for proposals from Maine artists for the creation of a Public Arts mural to be placed in the anteroom of the newly renovated MDOL offices in Augusta, Maine. *Stip.* ¶ 20; PRSAMF ¶ 20; DRPRSAMF ¶ 20. The "Call for Artists" specified that the mural was being commissioned to cover two contiguous walls in the anteroom—18.5 by 6 feet and 12 by 6 feet—above a knee wall. *Stip.* ¶ 22. The "Call for Artists" solicitation stated that the MDOL wanted a statement from the artist on her interest and approach to "art in public spaces" of the MDOL, specified that submissions should be submitted to Donna McNeil by June 1, 2007, and indicated that the Committee would make the final decision on the award of the commission to create the mural. *Stip.* ¶¶ 24-26; PRSAMF ¶ 21; DRPRSAMF ¶ 21. The Call for Artists incorporated portions of Mr. Scontras's March 17 letter to Leslie Manning suggesting what the mural might portray.[8] PRSAMF ¶ 22; DRPRSAMF ¶ 22. In requesting a "historically representative" mural, the Call for Artists, read in part:

---

Committee meetings and has allowed both the State Defendants and the Plaintiffs to do so. The Court DENIES the Plaintiffs' motion to strike the State Defendants' paragraph 17A.

[8] The Plaintiffs' original paragraph 22 stated:

> The Call for Artists adopted verbatim much of Scontras's March 17 letter to Leslie Manning suggesting what the mural might portray.

PRSAMF ¶ 22. The State Defendants objected, arguing that some but not much of the Scontras letter was in the "Call for Artists." DRPRSAMF ¶ 22. The Court compared Mr. Scontras's four-page letter with the one-page Call for Artists. It has concluded that the Plaintiffs' term "verbatim," defined as "word for word," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2542 (2002 ed.), overstates the facts and the State Defendants' phrase, "not much," understates them. The Court's "incorporated portions" language reflects the distinct similarity between the Call for Artists and the letter.

> Above all, the value and dignity of workers, and their critical role in creating the wealth of the state and nation should be emphasized. Symbols such as archive photography, labor newspapers, labor advocacy and legislation should be referenced. In essence, Maine workers should strongly be portrayed as more than an "impersonal" cost of production.

DSMF ¶ 22A; PRDSMF ¶ 22A. Two labor historians, including Mr. Scontras, were to be available for research assistance; $60,000 was available for the project. *Stip.* ¶ 23. Among the materials that applicants were required to submit was: "A **brief** one-page written statement and approach to art in the public places of this site." *Id.* ¶ 27 (emphasis in original).

### 5. Judith Taylor, Her Tour of the MDOL Office, and Her Proposal

Upon learning of the Call for Artists, Judith Taylor, a self-employed Maine painter with a studio and gallery in Seal Harbor, Maine, went to the MDOL office to look at the site and received a tour of the office area, including MDOL conference rooms and the anteroom where the mural was to be located. *Stip.* ¶ 28; PRSAMF ¶ 23; DRPRSAMF ¶ 23. Leslie Manning gave Ms. Taylor a tour of the entire office area. PRSAMF ¶ 24; DRPRSAMF ¶ 24. During her tour, Ms. Taylor observed other pieces of art and photos in the MDOL conference rooms. PRSAMF ¶ 24; DRPRSAMF ¶ 24. One of the conference rooms is the Frances Perkins conference room, which has five framed pictures including: a framed copy of a 1930s newspaper article from a Lincoln County newspaper profiling Frances Perkins; a photograph of Frances Perkins with President Roosevelt; a drawing of the Triangle Shirtwaist Fire by Clinton Kamp; a photograph of Frances Perkins; and a copy of the Time

10

magazine cover of Frances Perkins and postcard of Frances Perkins. *Stip.* ¶ 77. The Frances Perkins conference room is the only other area within the MDOL offices to which the public has direct access and where "viewing material" is located. *Id.*

Ms. Taylor submitted to the MDOL a number of images of her existing work, including several of her existing paintings of workers, landscapes, and other subjects. *Stip.* ¶ 30. In addition to the images Ms. Taylor submitted in response to the Call for Artists, she sent a letter expressing her interest in the mural project.[9] PRSAMF ¶ 28A; DRPRSAMF ¶ 28A. Ms. Taylor has said that although "art in public places" is a term often used to refer to Percent for Art projects, her approach for developing art for public places has been to express her own artistic ideas rather than the ideas of the contracting agency, whether it be a school, a courthouse, or a department of state government.[10] PRSAMF ¶ 29; DRPRSAMF ¶ 29.

### 6. The Initial Committee Screening

Eighteen applications were submitted in response to the "Call for Artists," including one from Judy Taylor. *Stip.* ¶ 29. On June 15, 2007, the Committee met and reviewed the submissions. *Stip.* ¶ 33. Ms. Fensterstock, who attended the June 15 meeting, recalls that the Committee discussed each of the eighteen

---

[9] The State Defendants denied this statement on the ground that the Plaintiffs have never produced such a letter. DRPRSAMF ¶ 28A. As the statement is based on Ms. Taylor's affidavit in which she states that she sent such a letter, the Court overrules the State Defendants' objection. *See* PRSAMF ¶ 28A (citing *Decl. of Judith Taylor* ¶ 8) (Docket # 47) (*Taylor Decl.*).

[10] The State Defendants interposed a qualified response to this statement, noting that with respect to Ms. Taylor there can be no doubt that the mural comported with the MDOL's themes. DRPRSAMF ¶ 29. Although the Court notes the State Defendants' qualified response, it does not negate Ms. Taylor's sworn statement about her general approach and therefore the Court deems the statement admitted.

submissions, focusing on the aesthetic quality and technical skills shown by each artist's submissions of his or her prior works.[11]   PRSAMF ¶ 31; DRPRSAMF ¶ 31. No one on the Committee discussed the subject matter suggested in the Call for Artists, expressed a belief that the artist selected should convey a message or viewpoint of the MDOL or the State, or voiced concern about whether the artist selected would or would not convey any particular message or viewpoint.   *Id.*   There was likewise no discussion of what message the mural should convey, how Maine workers should be portrayed, or whether the mural should be "pro-union" or "pro-business."   *Id.*   At the meeting, the Committee narrowed the artists to three, including Ms. Taylor, and asked them to submit formal proposals.   *Stip.* ¶ 33.

### 7.    From Screening to Selection

Following her selection as a finalist, Ms. Taylor began doing her own research on Maine's labor history and identifying themes and events that she found illustrative of that history.   PRSAMF ¶ 33; DRPRSAMF ¶ 33.   She created three maquettes, or studies, based on her reading of Maine labor history.   *Id.*   The maquettes represented Ms. Taylor's aesthetic idea of how to represent Maine's labor history.   *Id.*   In preparing her formal proposal, Ms. Taylor did not refer back to the solicitation but developed all of the ideas and presentations for the mural on her

---

[11] The State Defendants denied paragraph 31, which is an extended description from Ms. Fensterstock detailing her recollection of the Committee discussion and the absence of any discussion about Ms. Taylor conveying in her artwork a state-sanctioned message.  PRSAMF ¶ 31; DRPRSAMF ¶ 31.  The State Defendants say that state agency decision-makers are not subject to discovery absent clear proof of bias or misconduct and that the Plaintiffs are attempting to undermine the document memorializing the decision to commission Ms. Taylor.  DRPRSAMF ¶ 31. The Court included Ms. Fensterstock's recollection of the Committee discussion in its recitation. First, the Court is not presented with a discovery issue.  Second, a variance between the Public Art Notification and Ms. Fensterstock's recollection must be resolved by viewing the facts in the light most favorable to the non-movant.

own based upon her own research and discussions with Mr. Scontras, whom the Call for Artists had identified as a resource.[12]  PRSAMF ¶ 34; DRPRSAMF ¶ 34. Ms. Taylor submitted her formal proposal dated September 10, 2007.  *Stip.* ¶ 35.

On September 10, 2007, the Committee, including Mr. Scontras, met at the MDOL office in Augusta to evaluate the three finalists' proposals for the mural. PRSAMF ¶ 35; DRPRSAMF ¶ 35.  Before the finalists presented their proposals, there was no discussion among the members of the Committee as to what the Call for Artists had stated, what criteria the Committee should use in evaluating the proposals, or whether the mural should convey any particular content or theme, beyond the general theme of the history of labor in Maine.[13]  PRSAMF ¶ 36; DRPRSAMF ¶ 36.  No one at the MDOL ever suggested to Ms. Taylor or Mr. Scontras what message or content the mural should convey or what criteria Mr. Scontras should use in evaluating the proposals.  *Id.*

On September 10, 2007, Ms. Taylor made a PowerPoint presentation of her ideas for the design and composition of the mural, including her ideas of creating a multiple-panel mural and using multiple figures in the mural panels.[14]  PRSAMF ¶ 37; DRPRSAMF ¶ 37.  In her presentation, Ms. Taylor attempted to illustrate her

---

[12] The State Defendants denied this paragraph.  DRPRSAMF ¶ 34.  They say that there can be "no doubt" that Ms. Taylor's proposal and the mural comported with the themes set forth by the MDOL. Be that as it may, the Plaintiffs' assertion is properly supported by Ms. Taylor's sworn declaration, *Taylor Decl.* ¶ 14, and the Court is obligated to view this fact, as well as others, in the light most favorable to the Plaintiffs.

[13] The State Defendants denied paragraphs 36-38 and 39A through 42 for the same reasons set forth in footnotes 7 and 12.  DRPRSAMF ¶¶ 36-38, 39A-42.  For the same reasons described in footnotes 7 and 12, the Court deems the paragraphs admitted for purposes of this motion.

[14] Another artist among the three finalists made a presentation of a collage of hundreds of photographs of Maine workers.  PRSAMF ¶ 38; DRPRSAMF ¶ 38.

ideas on design and composition by showing the Committee images of some of her own figurative works, as well as works by well-known artists, including Caravaggio and Manet. *Id.* The Committee members asked Ms. Taylor about the materials she wanted to use, including whether she would use canvas and what kind of frames she would use. *Id.* The Committee also discussed that it was important for the mural to be well constructed and painted in a manner that would not deteriorate quickly, as it was meant to be a permanent installation. *Id.* No one on the Committee asked Ms. Taylor any questions about the viewpoint she wanted to convey through the mural. *Id.*

On September 10, 2007, "after interviewing the artists and viewing their maquettes, the Committee chose Judy Taylor to produce the 30' by 6' mural." *Stip.* ¶ 38. The Committee's decision to award the commission to Ms. Taylor was reached quickly by consensus.[15] PRSAMF ¶ 39A; DRPRSAMF ¶ 39A. Mr. Scontras favored Ms. Taylor's presentation because the way she proposed to present the themes about Maine's labor history was very friendly and inviting to the eye. PRSAMF ¶ 40; DRPRSAMF ¶ 40. Her depictions seemed clear and authentic, and he liked

---

[15] The State Defendants objected to this paragraph on the ground that it was their understanding that the Court had allowed the Plaintiffs to refile their responsive statement of material facts to clean up the variance between their original stipulation and their original responsive statement. DRPRSAMF ¶ 39A. Although the Court agrees that, as is reflected in the Court's Order dated November 8, 2011, the primary reason the Plaintiffs were allowed to submit a revised statement of material facts was the contradictions between the proposed facts and the parties' stipulation, the additional facts the Plaintiffs have proposed are cumulative and, especially because this case raises issues of public controversy, the Court has resolved that it is better not to be overly punctilious. The Court overrules the State Defendants' objection.

her idea immediately.[16]  *Id.*    Mr. Scontras also recalls that the Committee favored Ms. Taylor's presentation because her representations were clear and understandable and the Committee liked her style.   PRSAMF ¶ 41; DRPRSAMF ¶ 41.  Before determining to select Ms. Taylor's proposal, there was no discussion about what, if any, content, message, or viewpoint the Committee wanted the finished mural to express.   PRSAMF ¶ 42; DRPRSAMF ¶ 42.  The Public Art Notification provided that "Judy [Taylor] will be working closely with labor historian [Charles] Scontras to build the timeline and select significant imagery." DSMF ¶ 42A; PRDRSMF ¶ 42A.  According to the Public Art Notification Ms. McNeil prepared, Ms. Taylor "was selected because of her classic WPA style of painting and her in-depth research into the theme."  PRSAMF ¶ 43; DRPRSAMF ¶ 43; DSMF ¶ 38B; PRDSMF ¶ 38B.

### 8.   The Contract

On September 21, 2007, Kerstin Gilg, Public Art Associate at the MAC, sent Ms. Taylor a letter with a contract for creation of the mural.  *Stip.* ¶ 39.  Ms. Gilg's letter was modeled on a form letter the MAC used for Percent for Art programs, but this project was not a Percent for Art project and its reference to the Percent for Art program should have been removed.[17]   DSMF ¶ 39A; PRDSMF ¶ 39A.  The fee for

---

[16] Mr. Scontras found the photo collage interesting, but the way the artist proposed to arrange the pictures was crowded and unengaging in comparison to Ms. Taylor's proposal.   PRSAMF ¶ 40; DRPRSAMF ¶ 40.  Mr. Scontras has no recollection of the third proposal.  *Id.*

[17] Relying on Ms. McNeil's affidavit, the State Defendants say that Ms. Gilg used the MAC Percent for Art form by mistake and the reference to the Percent for Art program should have been removed. DSMF ¶ 39A.  The Plaintiffs objected on the ground that Ms. McNeil is not competent to testify about whether Ms. Gilg made this mistake.  PRDSMF ¶ 39A.  The Court overrules the Plaintiffs' objection and has included the statement.  The Plaintiffs elsewhere have stipulated that this project

the mural was $60,000.   DSMF ¶ 44A; PRDSMF ¶ 44A.   Ms. Taylor signed and returned the contract in December 2007.   *Stip.* ¶ 41.   The contract sets forth the terms and conditions of Ms. Taylor's engagement.   PRSAMF ¶ 45A; DRPRSAMF ¶ 45A.   Although the contract was not a Percent for Art project, it used in part a Percent for Art form as Rider A of the contract.   *Stip.* ¶ 47.   The reference to Percent for Art in the contract should have been removed.[18]   DSMF ¶ 47A; PRDSMF ¶ 47A. Portions of the contract provided that:

1) Ms. Taylor "shall act in the capacity of an independent contractor and not as an officer or agent of the State";

2) The Agreement Administrator is the MDOL's representative who "has the authority to curtail services if necessary to ensure proper execution";

3) The Agreement Administrator was Jane Gilbert, Deputy Commissioner of the MDOL;

4) The MDOL "may order changes in the work, the Agreement amount being adjusted accordingly";

5) "The performance of work under the Agreement may be terminated by the [MDOL] in whole, or in part, whenever for any reason the Deputy Commissioner shall determine that such termination is in the best interest of the [MDOL].   The Agreement shall be equitably adjusted to compensate for such termination, and modified accordingly";

6) "Any legal proceedings against the State regarding this Agreement shall be brought in State of Maine administrative or judicial forums";

---

was not a Percent for Art project and therefore it seems unarguable that the letter awarding the job should not have referred to Percent for Art provisions.

[18] The Plaintiffs made a similar objection to the last phrase in this sentence regarding whether the Percent for Art reference in the contract should have been removed. PRDSMF ¶ 47A.  Again, the Court overrules the objection.  As the parties agree that this was not a Percent for Art contract, it seems indisputable that the reference to Percent for Art in the contract should have been removed.

7) Ms. "Taylor agrees to indemnify, defend, and save harmless the State, its officers, agents and employees from any and all claims, costs, expenses, injuries, liabilities, losses and damages of every kind and description (hereinafter in this paragraph referred to as 'claims'), resulting from or arising out of this performance of this Agreement by [Ms.] Taylor.  Claims to which this indemnification applies include, but without limitation, the following: . . . [c]laims arising out of a libelous or other unlawful matter used or developed in connection with this Agreement";

8) Ms. Taylor shall "keep in force a liability policy, which policy includes the activity to be covered by this Agreement with adequate liability coverage to protect itself and [MDOL] from suits";

9) The contract "contains the entire Agreement of the parties, and neither party shall be bound by any statement or representation not contained therein";

10) "The artist shall create the work in accordance with the approved design.  Recognizing that the shift in scale from model to full scale requires artistic adjustments, the artist reserves the right to make minor changes in the final work as is deemed aesthetically or structurally necessary";

11) The artwork is described as:
   Title:  Maine Labor Mural
   Dimensions:  One wall: 12' 3/8" x 6' 3/4"   Second Wall: 12' 3/8" x 24"
   Material:   Prepared birch panels, grounded and gessoed, painted with oil paint.
   Description of the Work:   10 panels depicting selected episodes in the history of Maine labor;

12) "The artist has familiarized him/herself with the site and local conditions under which the work is to be installed, and had correlated his/her observations with the contracting agency";

13) Any changes in design would be addressed as follows:
   "The artist shall create the work in accordance with the approved design.  Recognizing that the shift in scale from model to full scale requires artistic adjustments, the artist reserves the right to make minor changes in the final work as is deemed aesthetically or structurally necessary";

14) "The permanent location of the work shall be: Department of Labor, Augusta, Maine";

15) Ms. Taylor was paid $25,000 upon signing the agreement, $25,000 upon completion of half of the work, and $10,000 upon completion and final acceptance of the installed work;

16) The MDOL "shall have the right of entry to the premises where the work is being done and/or where the materials for the work are stored for  purposes of inspecting the work and materials";

17) Ms. Taylor's status was as follows:

> Ms. Taylor "agrees to perform all work under this agreement as an independent contractor and not as an agent or employee of the State of Maine";

18) The MDOL's right to inspection and review was as follows:

> The [MDOL] "shall have the right at reasonable times and with advance notice to review the work while in the process of execution and to request and receive progress reports";

19) Regarding the identification plaque:

> The [MDOL] "agrees to provide and install an identification plaque for the work.  The written contents of the plaque shall include at least the following information: Title of the Art Work: The Maine Labor Mural Cycle; Year: 2007-2008; Artist: Judy Taylor; Commissioned for the Department of Labor and the citizens of Maine under the Percent for Art Act administered by the Maine Arts Commission.   The artist shall be consulted as to the design";

20) Ms. Taylor "warrants that the design of work being commissioned is the original product of her own creative efforts."[19]  Ms. Taylor agrees to deliver the work to the MDOL "free and clear of any liens or claims arising from any source whatsoever";

21) Ms. Taylor reserves the copyright of the mural to herself and provides that she has the right to control "the making and

---

[19] Noting that Ms. Taylor followed the theme set forth by the MDOL Call for Artists and was inspected and accepted by the MDOL, the State Defendants interposed a qualified objection to the part of this paragraph that says that the work is "the original product of her own creative efforts." DRPRSAMF ¶ 59.  The State Defendants, however, agreed in the Stipulation that this paragraph recited the provision set forth in the contract.  *Stip.* ¶ 48(U).  The Court includes it and views their qualified response as more in the nature of argument than fact.

dissemination of the copies or reproductions" of the mural; however, Ms. Taylor "shall not unreasonably refuse [the MDOL and/or MAC] permission to reproduce the work graphically for purposes strictly for the sole use and benefit of the public. [Ms.] Taylor agrees to give credit substantially in the following form: 'Originally owned by the Department of Labor and the State of Maine' in any public showing of reproduction of the work";

22) The MDOL "agrees that it will not intentionally destroy or alter the work in any way whatsoever without prior consultation with the [MAC] and the artist";

23) The MDOL "shall make every reasonable effort to consult with the artist and a professional conservator in all matters concerning repairs and restoration of the work";

24) "The work will be placed in the location for which it was selected. The contracting agency agrees that the artist and the [MAC] will be notified if, for any reason, the work has to be removed or moved to a new location. The artist and the [MAC] have the right to advise and consult with the contracting agency regarding this treatment of the work"; and

25) "Drawings, models, and specifications related to the mural remain the property of [Ms.] Taylor; however, they shall not be used by the artist on other projects or extensions of this project except pursuant to a subsequent agreement between [Ms.] Taylor and the [MDOL]."

*Stip.* ¶ 48; PRSAMF ¶¶ 49-58; DRPRSAMF ¶¶ 49-58.

## 9.    Funding Sources

The MDOL raised funding for the mural from sources other than "Percent for Art." *Stip.* ¶ 44. The contract was paid for by 10 different streams of funding, through the Reed Act, the Bureau of Labor Standards, the Bureau of Rehabilitation Services, the Center for Workforce Research and Information, and the Commissioner's Office – MDOL Overhead. *Stip.* ¶ 45.

## 10.    Ms. Taylor's Completion of the Contract

Ms. Taylor worked on the mural between September 2007 and August 2008. *Stip.* ¶ 49.  She developed all of the ideas for the mural on her own, based on her own research and periodic discussions with Mr. Scontras, who had been identified in the Call for Artists as a labor historian who would be available for research assistance.[20]  PRSAMF ¶ 59; DRPRSMF ¶ 59.  Mr. Scontras served as one of her resources for historical information and answers to factual questions, such as where to find specific information about events she was considering depicting in the mural. *Stip.* ¶ 50.  While creating the mural, Ms. Taylor did not reference and was not guided by the subject matter or themes mentioned in the Call for Artists, which she says was the only guidance she received from the State as to the mural's content.[21] PRSAMF ¶ 59; DRPRSMF ¶ 59.  No one in the MDOL, the MAC, or any other state agency indicated to Mr. Scontras what ideas he should propose to Ms. Taylor, what the mural should portray, or what viewpoint or message they hoped it would convey.[22]  PRSAMF ¶ 60; DRPRSAMF ¶ 60.  Ms. Taylor studied Maine's labor history, and labor history generally, to identify the major themes and events she wanted to depict.  *Stip.* ¶ 51.  There were many themes and ideas that she did not

---

[20] The State Defendants qualified their response to this sentence based on the same qualified response the Court addressed in footnote 10.

[21] The State Defendants denied this sentence, claiming that it is unlikely that Ms. Taylor would accept a commission based on the MDOL's Call for Artists, which provided that the work should emphasize "the value and dignity of workers and their critical role in creating the wealth of the state and nation," and then completely ignore the MDOL's guidance for the work.  DRPRSAMF ¶ 59 (quoting the Call for Artists at 1).  For the reasons set forth in footnote 12 and in accordance with the standard summary judgment praxis, the Court has included Ms. Taylor's sworn statement in its recitation of facts.

[22] The State Defendants denied this sentence based on their ongoing skepticism that Ms. Taylor was not guided by the MDOL given that the mural comported with MDOL-suggested themes. DRPRSAMF ¶ 60.  The statement is supported by Mr. Scontras's sworn declaration, *Scontras Decl.* ¶ 10, and in accordance with the standard summary judgment praxis, the Court has included it.

use—for instance, except to the extent they were part of the background historical images, she did not depict any railroads, ships, lobstermen, ice harvesting, blueberry picking, or many other subjects which are often seen as typical or emblematic of Maine's labor history.  PRSAMF ¶ 61; DRPRSAMF ¶ 61.  The Call for Artists states that some of these themes would be welcome.[23]  *Id.*

Mr. Scontras suggested some themes to Ms. Taylor that she might want to illustrate in the mural and Ms. Taylor accepted some of his suggestions and rejected others.  *Stip.* ¶ 52.  For instance, Mr. Scontras thought that the first labor party in Maine in 1831 and the first labor newspaper in the same year would be an interesting panel.  PRSAMF ¶ 62A; DRPRSAMF ¶ 62A.  He also thought the Richmond Island strike in 1636, the International Fisherman's Union created by Maine lobstermen in the early 1900s, and agricultural labor in Maine would be interesting subjects for panels.  *Id.*  Ms. Taylor did not use these ideas.  *Id.*  According to Mr. Scontras, she was clearly constrained by consideration of space limitations.[24]  *Id.*  No one at the MDOL gave Ms. Taylor any feedback, instruction, or suggestions as to how she should portray the history of Maine labor, nor did anyone at the MDOL comment on whether what she had done was in fact consistent with the views of the MDOL, or the state of Maine, concerning the history of Maine

---

[23] The State Defendants interposed a qualified response to this paragraph, again citing the Call for Artists and the MDOL's inspection of the mural while it was a work-in-progress and its acceptance of the work in its finished form.  DRPRSAMF ¶ 61.  The Court does not doubt that Ms. Taylor studied labor history in preparing the mural and that she considered depictions not incorporated into the mural, *Taylor Decl.* ¶ 21, and so has included the paragraph in its recitation of facts.

[24] The Plaintiffs' statement did not include this sentence.  PRSAMF ¶62A.  The State Defendants interposed a qualified response, indicating that Mr. Scontras's additional comment should be included to provide full context.  DRPRSAMF ¶ 62A.  The Court included the full statement from Mr. Scontras's sworn declaration.  *Scontras Decl.* ¶ 11.

labor.[25]  PRSAMF ¶ 63; DRPRSAMF ¶ 63.  During the eleven months between the award of the commission and the actual installation of the mural, the Contract Administrator, Jane Gilbert of the MDOL, came to Ms. Taylor's studio in Seal Cove twice to look at the work in progress and on one occasion, Ms. Gilbert was accompanied by Commissioner Laura Fortman.  *Stip.* ¶ 53.  Neither Ms. Gilbert nor Ms. Fortman made any suggestions as to what Ms. Taylor should portray or how she should portray it and simply indicated that they were delighted with her progress.[26]  PRSAMF ¶ 65; DRPRSAMF ¶ 65.  It was clear to Ms. Taylor from what they said that they respected her imagination and her artistic process.  *Id.*  Aside from these two visits, Ms. Taylor had no other communications with anyone from the MDOL, the MAC, or any representative from any other state agency from September 2007 until August 2008 beyond phone and email contact regarding payment schedule and progress updates.  *Stip.* ¶ 54; PRSAMF ¶ 66; DRPRSAMF ¶ 66.  No one at the MDOL ever gave Ms. Taylor any feedback, instruction, or suggestions on how to portray the history of Maine labor, nor did anyone at the MDOL comment on whether what she had done was, in fact, consistent with the views of the MDOL or the State on the history of Maine labor.[27]  PRSAMF ¶ 67; DRPRSAMF ¶ 67.

---

[25] The State Defendants denied this statement, pointing once again to the contents of the Call for Artists and the $5,000 the MDOL paid Mr. Scontras.  DRPRSAMF ¶ 63.  As the Plaintiffs' statement is supported by the record, *Taylor Decl.* ¶ 19, the Court has included it in its recitation of facts.

[26] The State Defendants interposed a qualified response, again referring to the contents of the Call for Artists.  DRPRSAMF ¶ 65.  As the statement is supported by the record, *Taylor Decl.* ¶ 16, the Court has included it.

[27] The State Defendants interposed a qualified response to paragraphs 66 and 67, referring to the MDOL's payment of $5,000 to Mr. Scontras for consultation services.  DRPRSAMF ¶¶ 66-67.  The

## 11.     The Location of the Mural

Ms. Taylor designed the mural specifically to fit into the space in the anteroom of the MDOL offices in Augusta. *Stip.* ¶ 55. The building in which the MDOL offices are located is privately owned and located several miles from the State Capitol Building. *Stip.* ¶ 56. The mural was installed in an anteroom, which is located approximately 125 feet down a corridor from the closest entrance and accessed by turning right off of the corridor. *Stip.* ¶¶ 58-59. The MDOL does not control the corridor or what can be hung on its walls. DSMF ¶ 58A; PRDSMF ¶ 58A. There are other agencies and private entities in this building, and the corridor is used by individuals going to them as well. *Stip.* ¶ 61. There are no bulletin boards or locations for members of the public to "speak" or to place political posters in the corridor or the anteroom.[28] DSMF ¶ 63A; PRDSMF ¶ 63A. The anteroom sign reads:

Maine Department of Labor

State Defendants acknowledge that "no one seems to be certain," but they say that the $5,000 appears to have been paid for Mr. Scontras's "work with Ms. Taylor." *Id.* The State Defendants' point is that in consulting with Mr. Scontras, Ms. Taylor was in effect consulting with the MDOL. On this record, however, there is no confirmation that the MDOL's 2008 payment to Mr. Scontras for consulting services in 2007 was, in fact, for consultation with Ms. Taylor. Viewing the record in the light most favorable to the Plaintiffs, the Court included the Plaintiffs' paragraphs 66 and 67 in its recitation of the facts.

[28] The Plaintiffs interposed a qualified response, noting that there was a public proceeding in the anteroom the day the mural was unveiled and that there is room on one of the walls for some additional message. PRDSMF ¶ 63A. The Court accepts the State Defendants' statement with the Plaintiffs' provisos.

In paragraph 63B, the State Defendants assert that the anteroom "was never intended to be a traditional, designated or limited forum for public speech, and it was not used for such purposes prior to the demonstration over the mural." DSMF ¶ 63B. The Plaintiffs denied this statement on the ground that a public event was held at the mural unveiling and that there was a demonstration over the mural in the anteroom after it was removed. PRDSMF ¶ 63B. The Court has not included the State Defendants' statement because in attempting to categorize the legal nature of the forum, the paragraph is a statement of law not fact.

Commissioner of Labor
Employment Service
Rehabilitative Service
Labor Standards (Safety Works)
Unemployment Compensation
Administrative Hearings
Center for Workforce
Research and Information

*Stip.* ¶ 60.  The anteroom is the place where visitors to the MDOL typically wait for their meeting, or for the person they are visiting to come and get them.  *Stip.* ¶ 62.

The anteroom is approximately 12 feet by 26 feet in size; three sides of the room are lined with nine chairs.  *Stip.* ¶ 63.  The mural was on two of these sides.  *Stip.* ¶ 64.  A donated framed pamphlet from the 19th century, which had been distributed to employers to encourage them to oppose a child labor bill pending before the Maine Legislature, was hung on the third wall in the anteroom.  *Stip.* ¶ 65.  The MDOL had chosen the pamphlet and placed it on the wall of the anteroom.  DSMF ¶ 65A; PRDSMF ¶ 65A.  The 19th century pamphlet was removed at the same time as the mural; thereafter, upon the donor's request, it was returned to him.  DSMF ¶ 65B; PRDSMF ¶ 65B.

The MDOL had also chosen and placed the material depicting Frances Perkins in the Frances Perkins conference room, which the public can gain direct access to from the public corridor when it is sometimes unlocked.  DSMF ¶ 77A; PRDSMF ¶ 77A; DSMF ¶ 77B; PRDSMF ¶ 77B.  The MDOL had chosen and placed material located in other parts of their offices where there is limited access to the public—such as interior corridors and offices where the public is allowed only if accompanied by staff—and these include framed pictures/biographies of people who

24

had conference rooms named after them, framed recent photographs of Mainers at work taken by an intern, framed artwork created by individuals with disabilities, historical photographs of people at work, three framed works of art—two depicting people at work in the early 20th century and the third of a group of striking shoe workers, and pictures of former Bureau of Labor Standards directors.  *Stip.* ¶ 78; DSMF ¶ 78A; PRDSMF ¶ 78A.

### 12.    The Eleven Panels of the Labor History Mural

The mural depicts scenes of Maine workers engaged in labor activities dating to colonial times.  PRSAMF ¶ 68A; DRPRSAMF ¶ 68A.  In its completed form, the mural consists of eleven panels, although Ms. Taylor's contract with the MDOL stated that the mural would contain ten panels.  PRSAMF ¶ 69; DRPRSAMF ¶ 69. In the course of producing the work, Ms. Taylor decided to add an eleventh panel depicting the future of Maine labor.  *Id.*  No one at the MDOL instructed Ms. Taylor to create only ten panels or claimed that she had breached the contract by creating eleven panels instead of ten.  PRSAMF ¶ 69A; DRPRSAMF ¶ 69A.  Ms. Taylor felt free to create what she deemed appropriate, based on her own artistic judgment. PRSAMF ¶ 70; DRPRSAMF ¶ 70.  She did not refer back to the solicitation after her selection, did not include a number of aspects in the solicitation in her finished mural, and it was she alone who decided what to depict in the mural.[29]  *Id.*

---

[29] This Plaintiffs' paragraph substantially echoes paragraphs 59 through 67 above.  The State Defendants interposed qualified responses to this and paragraph 82 based essentially on the same grounds the Court earlier addressed in paragraphs 59 through 67.  In accordance with the standard summary judgment praxis, the Court included both paragraphs.

After Ms. Taylor was chosen to create the mural in September 2007, she did not again refer to the Call for Artists solicitation and was not guided by the subject matter or themes mentioned in the Call for Artists solicitation. PRSAMF ¶ 82; DRPRSAMF ¶ 82. Ms. Taylor did not try to illustrate the rise of the post-industrial or global economy, and other than a reference to a labor newspaper, she did not use any symbols of labor advocacy or legislation, all of which were specifically referenced in the solicitation. *Id.* Ms. Taylor did not try to portray workers as "more than an impersonal cost of production," as stated in the solicitation. *Id.* Instead, she illustrated what she thought were important themes, events, and personalities in Maine's labor history. *Id.*

The mural's panels depict, *inter alia*, child labor, secret ballots for workers, the 1937 shoe strike in Lewiston and Auburn, labor reformers including Mainer Frances Perkins, the Triangle Shirtwaist Factory fire, and the Jay strike in 1987. DSMF ¶ 75B; PRDSMF ¶ 75B. The mural has been interpreted by many, including the Plaintiffs, as pro-labor. DSMF ¶ 76A; PRDSMF ¶ 76A.

### a.     Panel One:  The Shoemaker and His Apprentice

The first panel depicts a shoemaker and his apprentice. PRSAMF ¶ 71; DRPRSAMF ¶ 71. Ms. Taylor chose this subject because Maine had a thriving shoe industry in the past, and also because she learned that both Charles Scontras's father and grandfather had been shoemakers. *Id.* This is why, behind the shoemaker and his apprentice depicted in the foreground, she placed a tribute to

26

Mr. Scontras.  *Id.*  He is depicted as a shoemaker on this panel with his name prominently displayed.  DSMF ¶ 75C; PRDSMF ¶ 75C.

### b.      Panel Two: Child Labor

The second panel is about child labor.  PRSAMF ¶ 72; DRPRSAMF ¶ 72.  Ms. Taylor decided to portray the children sympathetically, but not pitifully.  *Id.*  This was not one of the subjects suggested in the solicitation, but Ms. Taylor thought that the history of child labor was an important part of Maine history, as well as national history.  *Id.*  It was solely her decision to portray this aspect of labor history.[30]  *Id.*

### c.      Panel Three: Textile Workers

The third panel depicts textile workers.  PRSAMF ¶ 73; DRPRSAMF ¶ 73.  Ms. Taylor imagined young women coming in from the farm to work in the factories.  *Id.*  She used period dresses and illustrated the women holding handkerchiefs to their mouths to illustrate the hazard of cotton dust in the factories.  *Id.*  It was solely her decision to portray this hazardous aspect of their lives.  *Id.*

### d.      Panel Four: Secret Ballot

The fourth panel depicts the secret ballot.[31]  PRSAMF ¶ 74; DRPRSAMF ¶ 74.  Ms. Taylor did not intend this panel to refer specifically to organized labor

---

[30] The State Defendants interposed qualified responses to paragraphs 72-82, noting their reiterated point about the MDOL's involvement in the mural.  DRPRSAMF ¶¶ 72-82.  In accordance with the standard summary judgment praxis, the Court included the paragraphs.

[31] The State Defendants denied this paragraph.  DRPRSAMF ¶ 74.  In addition to the qualification discussed in footnote 30, they quoted from a pamphlet that the MDOL prepared and made available in the MDOL anteroom, describing the fourth panel.  The MDOL-approved pamphlet read:

> THE SECRET BALLOT    This panel represents the significance of the secret ballot
> and depicts the act of workers placing their votes in a ballot box.  The secret ballot

but to the broader question of the effort to extend the right to vote to all citizens. *Id.* Ms. Taylor got some of the images for this panel from archive images of an Irish settlement town in Portland. *Id.* She created a visual of a man putting ballots into a ballot box. *Id.* The ballot box was representative of ballot boxes used during that time. *Id.* Ms. Taylor did not portray whether or not this was an election for public office or an election related to a union; that did not matter and no one ever questioned her about what she was depicting. *Id.*

### e.     Panel Five: Labor Day

The fifth panel depicts the first Labor Day. PRSAMF ¶ 75; DRPRSAMF ¶ 75. In Ms. Taylor's research, she learned that there had been many parades in Maine with workers carrying flags from their various unions, including the Stone Cutters Union, whose flag is displayed. *Id.* The figures in the Labor Day parade and all the panels are "studio models," that is, people that Ms. Taylor brought into her studio. These figures are not based on archive photos. *Id.*

### f.     Panel Six: Woods Workers

The sixth panel depicts woods workers. PRSAMF ¶ 76; DRPRSAMF ¶ 76. Ms. Taylor painted a father and son because, based on her research, she understood that often sons followed their fathers into woods work. *Id.* The man talking to the

---

protected workers' livelihoods from being threatened if their vote displeased their employers. In the background are illustrations of other Maine industries such as corn caning and pipe fitting. The top scene is that of an Irish tenement neighborhood in Portland.

DRPRSAMF ¶ 74. The Plaintiffs' version of Ms. Taylor's intentions clearly differs from the MDOL's accompanying pamphlet. However, in accordance with the summary judgment praxis, the Court accepts the Plaintiffs' version—the ballot panel was not meant to refer specifically to organized labor—as Ms. Taylor's purported intentions are supported by her sworn declaration. *Taylor Decl.* ¶ 26.

workers could be viewed as a Wobblie (Industrial Workers of the World) organizer; Ms. Taylor had read that the Wobblies had tried to organize woods workers at the beginning of the twentieth century in Maine.  *Id.*  He could also be viewed as a lumber recruiter.  *Id.*  These men were sent to various parts of Maine and Massachusetts to encourage men to come and work in the Maine woods.  *Id.* Consequently, this panel can be interpreted in two ways, which was Ms. Taylor's intention.  *Id.*  The figure on the right is holding a peavey, a tool used for rolling logs.  *Id.*  Ms. Taylor learned about the peavey based on her research, including a trip to Liberty Tool Company in Liberty and the Hulls Cove Tool Barn in Bar Harbor, both of which have barns full of old tools particular to Maine history.  *Id.*

### g.      Panel Seven: 1937 Shoe Workers Strike

This panel depicts the 1937 Shoe Workers Strike in Lewiston.  PRSAMF ¶ 77; DRPRSAMF ¶ 77.  In the foreground, Ms. Taylor depicted a contemporary newspaper of the French Canadian community, *Le Messager*, which she had found in the archives.  *Id.*  It was solely her decision to portray a strike as part of Maine's labor history.  *Id.*

### h.      Panel Eight: Frances Perkins

The eighth panel depicts Frances Perkins, a Mainer who served under President Franklin D. Roosevelt as the first female Secretary of Labor.  PRSAMF ¶ 78; DRPRSAMF ¶ 78.  In the background, there is a reference to the Triangle Shirtwaist Factory fire, which Frances Perkins witnessed, and to Rose Schneiderman, who led a march protesting working conditions in the garment

industry.  *Id.*  Ms. Taylor had a friend of hers pose for the image of Frances Perkins, wearing an old coat and a hat.  *Id.*  She thought Frances Perkins was important to Maine labor history.  *Id.*  None of these subjects was mentioned in the Call for Artists and, as with the other panels, it was solely Ms. Taylor's decision to portray these subjects.  *Id.*  Although the Triangle Shirtwaist Fire was not an event in Maine's labor history, Ms. Taylor thought that it affected history throughout the nation, including Maine, so she decided to include it.  *Id.*  No one ever told Ms. Taylor that this was inconsistent with the purpose of the mural.  *Id.*

### i.      Panel Nine: World War II Shipyard

The ninth panel depicts women in a shipyard during World War II.  PRSAMF ¶ 79; DRPRSAMF ¶ 79.  In the background, Ms. Taylor included images of women holding signs showing what kind of work they were doing in aid of the war effort.  *Id.*  This image was from an archive photo from World War II.  *Id.*  Although some individuals have referred to this panel as the Rosie the Riveter panel, that was a title provided by the MDOL in a pamphlet which it distributed about the mural, not a title that Ms. Taylor bestowed.  *Id.*

### j.      Panel Ten: 1987 International Paper Strike

The tenth panel depicts the 1987 International Paper strike in Jay, Maine.  PRSAMF ¶ 80; DRPRSAMF ¶ 80.  Ms. Taylor read about this strike and believed it was an important part of Maine's labor history.  *Id.*  She contacted Julius Getman, a law professor at the University of Texas who had written a book about that strike.  *Id.*  Professor Getman sent Ms. Taylor around twenty videotapes from the strike,

and Ms. Taylor looked at the images and was particularly struck by the images of picketers holding hands. *Id.* Ms. Taylor chose to illustrate picketers holding hands in the foreground and included old and young people together to illustrate the idea of community. *Id.* Some of the people in the background include Roland Samson, a leader in the strike, and Jesse Jackson, who came to Maine to speak in support of the strikers. *Id.* It was solely Ms. Taylor's decision to portray the strike. *Id.*

### k.    Panel Eleven: Future of Maine Labor

The eleventh panel portrays the future of Maine labor with the hand-off of the hammer, a universal symbol of labor, from the older generation to the younger. PRSAMF ¶ 81; DRPRSAMF ¶ 81. The figure in the background to the left of the young man's head is Ms. Taylor's framer, Raymond, and she included him as a tribute to small artisan-owned businesses in Maine. *Id.*

### 13.    The Installation, Unveiling, and Display of the Mural

On August 9, 2008, Ms. Taylor's husband and Raymond, her framer/carpenter, packed up the mural panels and took them to Augusta. *Stip.* ¶ 57. They installed the mural in the anteroom at the MDOL based on her instructions. *Id.* A plaque was placed in the anteroom stating:

**Judy Taylor**
**History of Maine Labor**
**Oil Paint Mural, Eleven Panels**

**2008**

Commissioned for the Department of Labor and
Administered by the Maine Arts Commission

"building Maine communities through the arts"

31

*Stip.* ¶ 73; PRSAMF ¶ 84; DRPRSAMF ¶ 84.[32]   The plaque, as installed, did not include the contract's reference to "Percent for Art" because this was not a "Percent for Art" project.   DSMF ¶ 48.T.1; PRDSMF ¶ 48.T.1.

The mural was unveiled at a public event in the anteroom on August 22, 2008.  *Stip.* ¶ 71.  At the reception to present the mural to the public, the speakers talked generally about how the mural honored the history of Maine workers. PRSAMF ¶ 86A; DRPRSAMF ¶ 86A.

The eleven panels of the mural were described and reproduced in a color pamphlet made available to the public in the anteroom of the MDOL.  *Stip.* ¶ 74. The pamphlet features Ms. Taylor, including her photograph, a description of her background and artistic training, and information about her other artwork.[33] PRSAMF ¶ 85A; DRPRSAMF ¶ 85A.   The MDOL prepared and approved the pamphlet describing the mural and made it available to the public in the anteroom or otherwise by request.  DSMF ¶ 75A; PRDSMF ¶ 75A.   Following Ms. Taylor's creation of the mural, it was displayed in the anteroom of the MDOL offices in Augusta; the anteroom is open to the general public.[34]   PRSAMF ¶ 87; DRPRSAMF

---

[32] The State Defendants interposed a qualified response, noting that there was only one plaque in the anteroom regarding the mural.  DRPRSAMF ¶ 84.  The Court is not sure of the significance of this qualification given that there is no suggestion in this paragraph or the Stipulation otherwise.

[33] The Plaintiffs' original paragraph 85A stated that the pamphlet "prominently" featured Ms. Taylor.  PRSAMF ¶ 85A.  State Defendants interposed a qualified response, noting that Ms. Taylor's information was contained on page three of a fifteen-page pamphlet.  DRPRSAMF ¶ 85A.  The Court has removed the adjective and left the facts.

[34] The State Defendants interposed a qualified response, quoting one of the Plaintiffs as stating that the anteroom "is the place where visitors to the MDOL typically wait either for their meeting or for the person whom they are visiting to come and get them."  DRPRSAMF ¶ 87.  The Court accepts this qualification, as it comports with paragraph 62 of the Stipulation, but notes that it is still true that the anteroom is open to the public.

¶ 87.  After the installation of the mural, Ms. Taylor sent in her bill for the final payment of $10,000, which was accepted and paid, in August of 2008.  *Stip.* ¶ 70.

**14.   The Proposed Removal of the Mural
and the Governor's Explanation**

John Butera is Governor LePage's Senior Economic Advisor who was appointed to deal with economic development and job creation issues.  *Stip.* ¶ 78.1.  Mr. Butera had visited the MDOL anteroom as a private citizen numerous times before January 2011 on business and had considered the mural to be overwhelming and pro-labor and anti-business.  *Id.*  An anonymous complaint dated February 24, 2011 and date-stamped February 28, 2011 from a "secret admirer" was addressed to Governor LePage complaining about the mural and declaring that "this mural is nothing but propaganda to further the agenda of the Union movement.  I felt for a moment that I was in communist North Korea where they use these murals to brainwash the masses."[35]  PRSAMF ¶ 90; DRPRSAMF ¶ 90.  Governor LePage had not seen the mural in person.  *Stip.* ¶ 89.

During the evening of March 22, 2011, a reporter contacted Ms. Taylor by telephone and informed her that the Governor intended to remove the mural from

---

[35] The Plaintiffs state in paragraph 91 that Mr. Butera proposed the mural be removed.  PRSAMF ¶ 91.  For authority they only cite the webpage of the *Lewiston Sun Journal*, a Maine newspaper.  *Id.*  The State Defendants denied the statement, saying that a newspaper is not a proper source to support a statement of undisputed material fact.  DRPRSAMF ¶ 91.

The Court agrees with the State Defendants.  The record evidence upon which the proponent of an undisputed material fact relies must be admissible.  Contents of a newspaper article are not typically admissible for their truth.  But, here, the Plaintiffs have taken it one step further.  They have not produced the article or made it part of the record; instead, they have cited a website for the Court to look up the article.  This is clearly improper.  The Court cannot know whether what it might find on the internet is an accurate reflection of what the Plaintiffs cited.  At the very least, the Plaintiffs should have produced a screenshot of the website article; however, even if they had, it is doubtful the Court would accept its contents for their truth.  The Court has not included this statement in its recitation of facts.

the MDOL anteroom.  PRSAMF ¶ 93; DRPRSAMF ¶ 93.  Later that week, Adam Fisher of the MDOL contacted Ms. Taylor and informed her that the mural was going to be removed.[36]  *Id.*  Ms. Taylor does not recall whether she actually spoke to Mr. Fisher or whether he left a voice message but is certain that at no time did she assent expressly or implicitly to the removal of the mural; rather, the removal was presented to her as a fait accompli.  *Id.*

By email dated March 22, 2011, Acting Commissioner Laura Boyett announced the planned removal of the mural and conference room changes to all 500-plus MDOL staff.  *Stip.* ¶ 79.  The text of Ms. Boyett's email read in part:

> We have received feedback that the administration building is not perceived as equally receptive to both businesses and workers— primarily because of the nature of the mural in the lobby and the names of our conference rooms.  If either of our two constituencies perceives that they are not welcome in our administration building and this translates [to] a belief that their needs will not be heard or met by this department, then it presents a barrier to achieving our mission.
>
> I will be seeking a new home for the mural and we will be renaming the conference rooms . . . .

*Stip.* ¶ 81.  Within hours, apparently because the email was re-sent to the media, the press was contacting various members of the administration.  *Stip.* ¶ 82.

On March 23, 2011, Dan Demeritt, a former spokesman for the LePage administration, mentioned that some business owners had raised concerns about the mural.  PRSAMF ¶ 98; DRPRSAMF ¶ 98.  He declared that the mural, along

---

[36] The State Defendants interposed a qualified response to the statements in paragraph 93, noting that Mr. Fisher and Ms. Taylor have different recollections about the details of his call to her. DRPRSAMF ¶ 93.  Having reviewed both Mr. Fisher's affidavit and Ms. Taylor's Supplemental Declaration, the Court concludes that paragraph 93 fairly summarizes their conflicting memories. *See* DSMF ¶ 82A; PRDSMF ¶ 82A.

with the names of the MDOL conference rooms, represented "one-sided décor" inconsistent with the MDOL's goals.  *Id.*  Mr. Demeritt also stated that "the message from State agencies needs to be balanced," and "I just want to emphasize that we were merely looking to achieve a little aesthetic balance.  It's very minor."  *Stip.* ¶ 84.

Adrienne Bennett, Press Secretary to Governor LePage, stated that the Governor's Office had received an anonymous written complaint regarding the mural.  *Stip.* ¶ 85.  Ms. Bennett informed reporters that the administration did not give validity to the specific sentiments in the complaint.  PRDSMF ¶ 85B.  Initially, the complaint was described as a fax but Ms. Bennett later confirmed it was a letter.  *Stip.* ¶ 85; DSMF ¶ 85; PRDSMF ¶ 85A.  Ms. Bennett also claimed that several unnamed business officials had complained about the mural.[37]  PRSAMF ¶ 96; DRPRSAMF ¶ 96.  On or about March 24, 2011, Ms. Bennett further stated that "the [MDOL] is a State agency that works very closely with both employees and employers, and we need to have a décor that represents neutrality."  PRSAMF ¶ 97; DRPRSAMF ¶ 97.

On March 25, 2011, Governor LePage released the following statement in a press release:

> Without workers and employers, we do not have an economy.  Maine's Department of Labor needs to serve and balance the interests of both employees and employers to accomplish its mission.  I encourage anyone with artwork that celebrates the cooperation that exists in

---

[37] For support, using an internet citation, the Plaintiffs cited *The New York Times*, which would ordinarily be insufficient.  *See* fn. 35 *supra*.  However, the State Defendants admitted the paragraph and as there is no controversy, the Court accepted the statement.

Maine's workplaces to consider offering it for display at any
Department of Labor or Career Center Location.

I appreciate the effort and talent Ms. Taylor devoted to the creation of
her mural as well as the important history it represents.  I am pleased
that her work of art will be prominently displayed in Portland City
Hall, the site of Maine's first State House.

*Stip.* ¶ 87.  In the same press release, Governor LePage stated that he:

is asking for artwork that depicts the cooperative relationship that
exists between Maine's job creators and the workers who power
Maine's economy.  Artists interested in participating should be willing
to offer their artwork on loan to the State.  Appropriate submissions
will be displayed in public places at the [MDOL]'s Administrative
offices and in the lobbies of Career Centers throughout Maine.

*Stip.* ¶ 88.  Governor LePage ordered removal of the mural from display at the

MDOL based on the complaints he had received and on his own perception that the

mural was a one-sided portrayal of labor history not acceptable to business

interests.[38]  PRSAMF ¶ 100; DRPRSAMF ¶ 100.

### 15.   Attorney Beal Intervenes

During the afternoon of March 25, 2011, Attorney Jonathan S.R. Beal faxed

and emailed a letter to Joseph Phillips and Sheila McDonald, Director and Deputy

Director of the Maine State Museum respectively, and to Governor LePage,

objecting to the proposed removal of the mural.  *Stip.* ¶ 102.  Attorney Beal

requested that before the mural was removed the Director of the Museum, as

Trustee of state-owned works of art, hold a hearing to determine the mural's

appropriate location and that the mural "not be removed from its current location,

---

[38] The State Defendants interposed a qualified response, denying this statement to the extent it
differs from the contents of the Stipulation.  DRPRSAMF ¶ 100.  The State Defendants, however,
have been free to place before the Court any additional evidence they believe the Court should
consider.  The Court included the Plaintiffs' statement in its recitation of the facts.

nor obscured, covered or otherwise removed from sight, until a hearing or similar vehicle for public input has been followed."[39]   PRSAMF ¶ 101A; DRPRSAMF ¶ 101A.   Neither Director Phillips nor Deputy Director McDonald had any role in the removal of the mural; they learned that the mural had been removed at the same time as the information was made available to the general public.[40]   DSMF ¶ 105A; PRDSMF ¶ 105A.

### 16.   The Mural Is Removed

While the mural was still in the anteroom, on March 25, 2011, a demonstration was organized against removal of the mural.   *Stip.* ¶ 90.   Several hundred demonstrators entered the MDOL building and, in particular, demonstrators filled the anteroom.[41]   DSMF ¶ 90A; PRDSMF ¶ 90A.   Several demonstrators were reported to have threatened to form a human chain to prevent the administration from taking down the mural.[42]   DSMF ¶ 90B; PRDSMF ¶ 90B. In view of the public safety concerns raised by the demonstration and the reported

---

[39] The Plaintiffs' paragraph contends that Mr. Beal asked the MDOL to hold the hearing.  PRSAMF ¶ 101A.  Even though the State Defendants did not object on this basis, it is clear from Mr. Beal's letter that he was writing the Maine State Museum, not the MDOL, and was asking the Director and Deputy Director of the Museum to hold the hearing and determine the appropriate location of the mural.  *Stip.* Attach. 31 *Letter from Attorney Jonathan S.R. Beal to Maine State Museum, Attn: Joseph R. Phillips, Director, and Sheila McDonald, Assistant Director* (Mar. 25, 2011).  The Court has inserted language from the letter itself in its recitation of the facts.

[40] The Plaintiffs object to Deputy Director McDonald's assertion that Director Phillips had no such role.  PRDSMF ¶ 105A.  The Court overrules the objection.

[41] The Plaintiffs object to this statement based on an asserted lack of personal knowledge on the part of Mr. Fisher, the affiant.  PRDSMF ¶ 90A.  The Court overrules this objection.

[42] The Plaintiffs object to this statement based on hearsay and an asserted lack of personal knowledge on the part of Mr. Fisher.  PRDSMF ¶ 90B.  The Court overrules this objection.  The Court treats the statement as being not for the truth of the matter but to explain the way in which the administration took down the mural.

threat, the mural was removed from the anteroom on Sunday, March 27, 2011. *Stip.* ¶ 91; DSMF ¶ 91A; PRDSMF ¶ 91A.

Specifically, on that Sunday, employees of the lessor of the building where the MDOL is located removed the mural from the MDOL anteroom.   PRSAMF ¶ 102; DRPRSAMF ¶ 102.   No public hearing was held before the removal of the mural.   *Stip.* ¶ 110; PRSAMF ¶ 103; DRPRSAMF ¶ 103.   Neither Mr. Phillips nor any person associated with the Maine State Museum supervised, observed, or directed the removal of the mural or otherwise assured its safe handling and storage.   PRSAMF ¶ 104; DRPRSAMF ¶ 104.   Although several ideas have been expressed regarding hanging the mural elsewhere, those are now on hold pending the outcome of this litigation.   *Stip.* ¶ 94.

### 17.   After the Removal

On March 28, 2011, Adrienne Bennett issued a press release stating:

> The mural has been removed and is in storage awaiting relocation to a more appropriate venue.   Workers and employers need to work together to create opportunity for Maine's 50,000 unemployed.   We understand that not everyone agrees with this decision, but the [MDOL] has to be focused on the job at hand.

*Stip.* ¶ 92; PRSAMF ¶ 105; DRPRSAMF ¶ 105.   Governor LePage stated on a radio program:

> I'm trying to send a message to everyone in the state that the state of Maine looks at employees and employers equally, neutrally and on balance.   The mural sends a message that we're one-sided, and I don't want to send that message.

*Stip.* ¶ 93.   The same day, Deputy Director McDonald responded to Attorney Beal's March 25, 2011 letter.   *Stip.* ¶ 104.   In it, she claimed that the mural was not

"historical material" within the meaning of 27 M.R.S. § 86-A.  PRSAMF ¶ 106; DRPRSAMF ¶ 106.  Rather, Ms. McDonald stated that the policy and practice of Director Phillips and the Museum is to consider only "older paintings, not contemporary paintings depicting historical events" to be historical materials.[43]  *Id.* Deputy Director McDonald's letter disagreed with Attorney Beal's contention that the Museum is responsible for the mural, stating:

> The Maine State Museum's long-held view of the statutory language limits museum responsibility to older paintings, not contemporary paintings depicting historical events.  To our knowledge, your interpretation of the law has no precedence.

DSMF ¶ 105B; PRDSMF ¶ 105B.  Ms. McDonald's letter also notes that she understands that the mural was removed over the weekend and is safely in storage, and clarifies that it is not at the Maine State Museum.  DSMF ¶ 105C; PRDSMF ¶ 105C.

Before receiving Ms. McDonald's March 28, 2011 letter, Attorney Beal sent a second letter also dated March 28, 2011 to Governor LePage, Director Phillips and Deputy Director McDonald, questioning, among other things, where the mural was

---

[43] The State Defendants interposed a qualified response on the ground that the Museum policy has been in existence since 1996.  DRPRSAMF ¶ 106.  The Court notes the State Defendants' qualification but does not conclude that the date the policy was adopted is a material fact.  On August 22, 2011, the Plaintiffs moved to strike the State Defendants' references to the 1996 policy. *Pls.' Mot. to Strike* at 2-3.  The Court DENIES this portion of the Plaintiffs' motion to strike.

Although the State Defendants did not object, the Court replaced the Plaintiffs' language because it does not accurately reflect the language of the letter attached to the Stipulation filed by the parties. *See Stip.* Attach. 32 *McDonald Letter of March 28, 2011 (McDonald Letter)*.  The Plaintiffs' paragraph reads that Ms. McDonald wrote that the Director and the Museum only consider "older paintings depicting historical events," PRSAMF ¶ 106, but the letter itself states that the Director and Museum only consider "older paintings, not contemporary paintings depicting historical events." *McDonald Letter*.  The Court has inserted the correct language in its recitation of facts.

being stored.  *Stip.* ¶ 106; PRSAMF ¶ 107; DRPRSAMF ¶ 107.  Ms. McDonald

responded to Attorney Beal's second letter by email that same day.  *Stip.* ¶ 108.  On

behalf of Director Phillips and the Museum, she wrote:

> Regarding the questions that you asked in your letter dated 28 March
> 2011, Museum staff were not involved at all in the mural's removal
> and we do not know the mural's present location.  It is not here at the
> Museum.

PRSAMF ¶ 108; DRPRSAMF ¶ 108; DSMF ¶ 109A; PRDSMF ¶ 109A.  The Maine

State Museum and the state of Maine have countless historical objects, including

works of art, which are not on display.  DSMF ¶ 109B; PRDSMF ¶ 109B.  It would

be impossible to exhibit or display the countless historical objects, including works

of art, held by the Maine State Museum and the state of Maine.  DSMF ¶ 109C;

PRDSMF ¶ 109C.  Deputy Director McDonald is not aware of the State Museum

ever conducting a public hearing regarding the location of or removal of an

historical object within the jurisdiction of the Maine State Museum.  DSMF ¶ 109D;

PRDSMF ¶ 109D.

### 18.  Ms. Taylor Seeks Access

In May 2011, Ms. Taylor contacted by telephone at least two members of the

administration, seeking to view and photograph the mural.  *Stip.* ¶ 95.  On May 16,

2011, the Maine Office of the Attorney General sent Ms. Taylor a letter stating: the

"mural has been carefully placed in crates made of birch wood"; the "mural is being

stored in a safe, secure, climate-controlled room"; that they have photographs of the

mural taken at the time of the unveiling in 2008 and would be happy to email those

to her; that "no final decision has been made regarding where the mural will be

displayed" because the "present litigation has placed that decision on hold, and we will not be finalizing that decision until the litigation has concluded"; and that "it is our intent and desire to discuss with you, at that time, plans for the mural, and we value your input." *Stip.* ¶ 96. If the mural is in birch crates, this could be an appropriate means of storage. DSMF ¶ 91B; PRDSMF ¶ 91B. Although the Plaintiffs have not been allowed access to the mural, the State Defendants claim that the mural is stored safely in an appropriate, climate-controlled location. DSMF ¶ 91C; PRDSMF ¶ 91C.

By letter dated May 19, 2011 and received May 26, 2011, Ms. Taylor again sought access to the mural to "take professional quality photographs to insure the mural is properly remembered until plans for its placement be discussed and decided." *Stip.* ¶ 98. The Office of the Attorney General responded with two emails on May 31, 2011 and sent her photographs of the mural that the Office said it hoped would suffice. *Stip.* ¶ 100. Following the removal of the mural, the State Defendants have refused to disclose where the mural is being stored or to permit Ms. Taylor to inspect and take pictures of the mural.[44]   PRSAMF ¶ 112; DRPRSAMF ¶ 112.

### 19.   Maine's Percent for Art Program

Maine has a statutory Percent for Art program (16 M.R.S. § 451 *et seq.*) that provides, among other things, funding for the creation and display of art in public

---

[44] The State Defendants interposed a qualified response, noting that they had attempted to be cooperative "taking into account the public safety issues involved." DRPRSAMF ¶ 112. The State Defendants' response does not contradict the Plaintiffs' paragraph and therefore the Court included the Plaintiffs' paragraph.

buildings in Maine. *Stip.* ¶ 111; PRSAMF ¶ 113; DRPRSAMF ¶ 113. Under the terms of the statute, public buildings and facilities, other than schools and correctional facilities, must spend at least 1% of any funds allocated by the Legislature to acquire, transport, and install works of art. *Stip.* ¶ 111. Schools must spend 1% or $50,000, whichever is less. *Id.* The MAC administers the program. PRSAMF ¶ 113; DRPRSAMF ¶ 113. As a result of the Percent for Art Program, thousands of pieces of art have been installed in public buildings throughout Maine. *Stip.* ¶ 112. The "Public Arts Program" is summarized at http://mainearts.maine.gov/program_publicarts.aspx. *Stip.* ¶ 114. Since May 1, 2007, three art projects have been funded through Maine's "Public Arts Program," not using Percent for Art program funds: this mural, and art for the Alfond Center and the Harry Faust Foundation. *Stip.* ¶ 116.

### 20.  The Views of Professors Christina Bechstein and Lauren Fensterstock

#### a.  The Professors

Christina Bechstein, a Maine artist, is employed as a professor at the Maine College of Art in Portland, and is familiar with the functions of the MAC, the Percent for Art program, and public arts programs in Maine in general.[45]  PRSAMF

---

[45] The State Defendants object to the Plaintiffs' statements from Professors Bechstein and Fensterstock on several grounds: (1) that neither Professor Bechstein nor Professor Fensterstock has been qualified as an expert in the field of public art; (2) that these witnesses are expressing their own personal views in the guise of expert opinions; (3) that whether a reasonable viewer would view the mural as government speech or Ms. Taylor's speech is not a proper subject for expert testimony; (4) that neither Professor Bechstein nor Professor Fensterstock considered all of the necessary facts and factors; (5) that the MDOL project was expressly not a Percent for Art project; and, (6) that, unlike the Professors' descriptions of public art projects, the MDOL project was directed toward a specific theme.  DRPRSAMF ¶¶ 116-32.

¶ 116; DRPRSAMF ¶ 116.  According to Professors Bechstein and Fensterstock, Professor Bechstein is recognized as an authority in the field of public art.  *Id.* Based on her education and experience, Professor Bechstein states that she is well-qualified to testify concerning the role of public art in Maine, the role of the MAC and Percent for Art program in shaping an understanding of public art among the arts community and the general public, and the likely effects of possible changes in that understanding.  *Id.*  Lauren Fensterstock, another Maine artist, is employed as a Professor at the Maine College of Art in Portland, is familiar with the MAC and public arts programs in Maine, and has served on MAC advisory committees to select artists to create public art.  PRSAMF ¶ 117; DRPRSAMF ¶ 117.

### b. Art in Public Places, the Maine Arts Commission, and the Maine Percent for Art Program

According to Judy Taylor and Professor Bechstein, "art in public places" is a term often used to refer to Percent for Art projects.  PRSAMF ¶ 116; DRPRSAMF

---

Each of these objections raises troubling issues about the ultimate admissibility of this proposed testimony.  However, a motion for summary judgment is not a motion *in limine.*  These opinions are embedded in a motion for summary judgment and the Court is required to view the Plaintiffs' evidence in the light most favorable to them.  Although this rubric does not make inadmissible evidence admissible, the Court is still obligated to recite the Plaintiffs' best case to determine whether they have raised genuine issues of material fact in defense of the motion.  At the same time, the Court has altered the Plaintiffs' statements about the opinions of Professors Bechstein and Fensterstock to establish that the statements reflect their views, not unalterable fact.  Also, the Plaintiffs have mixed in with the professors' opinions, the opinions of Judy Taylor, the artist.  Ms. Taylor's opinions about her own art are different from the professors' professional opinions about art in general or this mural.  The Court has sought to specify whose opinion is being expressed.

The Court's inclusion of Professor Bechstein's and Professor Fensterstock's statements in its recitation of facts does not predict whether or to what extent either professor would be allowed to testify at trial.  Accepting the evidence for the moment, the Court addresses the significance of this proffered evidence in its discussion.

¶ 116.[46]  Judy Taylor says that her approach to developing art in public places is to express her own artistic ideas and not to try to express aesthetic ideas of the contracting agency.  *Id.*  Professors Bechstein and Fensterstock say that this is the same approach taken by the MAC and the State.  *Id.*  Professor Fensterstock states that the Call for Artists and the Public Art Notification issued in this case would let members of the public know that the mural was a public arts project and that Percent for Art criteria and procedures were employed in the selection decision. PRSAMF ¶ 117; DRPRSAMF ¶ 117.

To Professor Bechstein's knowledge no person with a role at the MAC, or any responsible person in the public arts field in Maine, has ever expressed the belief that art of Maine's "art in public places" and other public art programs is meant to express a message or viewpoint of the contracting agency or the State.  PRSAMF ¶ 118; DRPRSAMF ¶ 118.  In her view, the stated goal of supporting "freedom of artistic expression essential for the well-being of the arts" would be frustrated, not advanced, if members of the public were to be told, or if they came to believe, that public art supported by the state of Maine, or by its agencies, was in fact "government speech," expressing a message on behalf of the State itself, rather than expressing the free artistic expression of the artist.  *Id.*

According to Professor Fensterstock, no advisory committee on which she has served has ever expressed the belief that the art in public places programs of the MAC, or the Maine Percent for Art program, was meant to express a message or

---

[46] The Plaintiffs Statement of Material Facts starts with paragraph 1 and goes through paragraph 117; it then starts again at paragraph 116 and continues through  paragraph 135 so there are two paragraphs 116 and 117.  PRSAMF ¶¶ 1-135.

viewpoint of the State, or to convey some particular thought or instill some feeling in those who saw the work, other than the thoughts and feelings conveyed by the artist.  PRSAMF ¶ 119; DRPRSAMF ¶ 119.

### c.   The Professors' Understanding of the Public Understanding

The Professors opine that by selecting an artist to perform a commission, the MAC is expressing a preference for that artist over others, but that selection is based on conceptual and aesthetic considerations concerning the artist's work, not on an expectation that the artist will convey a thought or a feeling on behalf of the State.  PRSAMF ¶ 120; DRPRSAMF ¶ 120.  Based on Professor Fensterstock's long experience with the MAC and the way in which the public arts programs have been implemented and presented to the public over the years, she believes that any reasonably well-informed member of the public, viewing a piece of public art commissioned and paid for by the State under any public arts program, would understand that the artwork was expressing the views of the artist and not the State itself.  PRSAMF ¶ 121; DRPRSAMF ¶ 121.  Similarly, based on Professor Bechstein's experience with the MAC and the way in which the public arts programs have been implemented and presented to the public over the years, she likewise believes that any reasonably well-informed member of the public, viewing a piece of public art commissioned and paid for by the State under any public arts program, would understand that the artwork was expressing the views of the artist and not the State itself.  PRSAMF ¶ 122; DRPRSAMF ¶ 122.

The Professors say that over the past several decades, Maine has succeeded in selecting artists with a wide range of views and vision, and one of the most valuable aspects of Maine's programs is that they provide public platforms for so many artists to express those visions. PRSAMF ¶ 123; DRPRSAMF ¶ 123. They believe that over the past several decades, the State and the arts community in Maine have successfully conveyed the understanding that public art in Maine, even when commissioned and paid for by the State, presents the free artistic expression of the artists who have created the artwork. PRSAMF ¶ 124; DRPRSAMF ¶ 124. Further, they express the view that for several decades, the State has actively promoted Maine as a place for the public to view and purchase art and to support artists. PRSAMF ¶ 125; DRPRSAMF ¶ 125. They say that Maine's Percent for Art program and other programs for art in public places are key elements of this program of arts promotion. *Id.* They opine that in Maine, members of the public generally understand public art to be the expression of the artist herself, not an expression of the views, thoughts, or feelings favored by the institution or individual who commissioned the artwork. PRSAMF ¶ 126; DRPRSAMF ¶ 126. They say that the robust public arts programs in Maine, instituted over the past several decades, have intentionally reinforced this public understanding of the source of any messages conveyed by public art. *Id.*

### d.   Artists and the Government Speech Doctrine

Professor Bechstein is herself currently engaged in a public arts project, awarded through the MAC, collaborating and giving voice to members of the public

concerning some aspects of their local history and culture. PRSAMF ¶ 127; DRPRSAMF ¶ 127. Professor Bechstein says that if she were to understand that her public artwork was considered to be "government speech," she would refuse the commission and would not apply for other public art commissions through the MAC or any other program where her work was considered to be "government speech." *Id.* Similarly, Professor Bechstein contends that if she were to understand that because her work was considered to be government speech, it could be altered, removed, or destroyed if the government decided it did not like the message, she would refuse the commission and would never apply for another public art commission through the MAC or any other program where her work was considered to be "government speech," nor would she encourage her students to apply. PRSAMF ¶ 128; DRPRSAMF ¶ 128. It is Professor Bechstein's opinion that most artists would shun any program where their work was considered to be "government speech" or an expression of views controlled or approved by the government, and would consider such work more in the realm of advertising or public relations. *Id.* According to Professor Bechstein, if the art produced in Maine's public arts programs was not considered to be an artist's own free artistic expression, but rather to be "government speech," most Maine artists would no longer want to be associated with those programs. PRSAMF ¶ 129; DRPRSAMF ¶ 129. Those programs would then, she believes, be viewed as public relations enterprises of the State, rather than as they are viewed today: as public programs which encourage "freedom of artistic expression essential for the well-being of the

47

arts" and "enhance culture and the arts and encourage the development of artists." *Id.*

Similarly, both Professors Fensterstock and Bechstein believe that, if Maine artists came to believe that the art produced in Maine's public arts programs was not considered to be an artist's own artistic vision, but rather was an expression of the views of the State, participation in public arts programs by Maine's creative community, would plummet. PRSAMF ¶ 130; DRPRSAMF ¶ 130. It is Professor Bechstein's opinion that, if the general public came to believe that the art produced in Maine's public arts programs was not an artist's own artistic vision, but was a means of the government conveying some thought or instilling some feeling in those who saw the work, this would cause great harm to Maine's reputation as a creative community. PRSAMF ¶ 131; DRPRSAMF ¶ 131. If the substantial out-of-state private funding sources for Maine's public arts programs, including private foundations, came to understand that the art produced in Maine's public arts programs was deemed "government speech," it is Professor Bechstein's opinion that such funding sources would greatly diminish. PRSAMF ¶ 132; DRPRSAMF ¶ 132. According to Professor Bechstein, it is arbitrary to apply the label "older" to categorize artwork and no reputable museum uses the label "older" in categorizing artwork. PRSAMF ¶ 133; DRPRSAMF ¶ 133. Professor Bechstein does not believe that the Maine State Museum, in fact, limits any of its collections to "older" items; nor has the Museum, to her knowledge, ever limited its definition of "works of art

dealing with historic subjects" to "older paintings."  PRSAMF ¶ 133; DRPRSAMF ¶ 133.

### 21.    The Brian Williams and Jon Chrisos Interviews[47]

On September 26, 2011, Brian Williams, the NBC news anchor, interviewed Governor LePage on national television and asked the Governor, who was introduced as part of a panel of governors at the National Education Conference, about the mural controversy:

> BRIAN WILLIAMS:      Because this is an education oriented group, you perhaps won't mind this is all by the way of a windup for a question for Governor LePage of Maine who can now only sit here and wonder where I am going.  I am going to take you back to 1943-44.  A little place on the Atlantic Coast called Bath Iron Works.  They helped win World War II.  They made a new destroyer every 17 days.  Which brings us to the Governor of Maine.  Governor, if you take folks who watch NBC nightly news, we are generalists.  We have 22-23 minutes to cover the whole country.  About the only thing they've heard about the Governor of Maine is that he ordered a mural removed.  And on the mural is a depiction of among other things Rosie the Riveter working at Bath Iron Works.  And along the way they heard the Governor wanted some conference rooms renamed.  Among them one of them named for Frances Perkins—one of the most towering figures in the history of the U.S.  We named our labor building after her.  We never had a secretary serve longer in the FDR years.  It would lead a normal adult to ask what do you have against organized labor?
>
> GOV. PAUL LEPAGE:    I have absolutely nothing against organized labor.
>
> BRIAN WILLIAMS:      [Garbled] the murals?

---

[47] The State Defendants objected to the introduction of the substance of the Brian Williams interview and the Court overruled their objection.  *Order Granting Mot. to Reopen Record on Mot. for Summ. J.* (Docket # 68).  The State Defendants also objected to only a portion of the interview being recited and referred to the complete transcript.  DRPRSAMF ¶ 134.  The Court included the full transcript.

Regarding the Chrisos interview, the Court included only the portion related to the mural.

GOV. LEPAGE:    My objection to the mural is simply where the money came from.  The money was taken out of the unemployment insurance fund which is dedicated to provide benefits to unemployed workers.  They robbed that account to build the mural.  And until the[y] pay for it, it stays hidden.

BRIAN WILLIAMS:    So you punished the mural for the funding. You ordered the mural taken away.

GOV. LEPAGE:    Well, we've put it under safe lock and key.

BRIAN WILLIAMS:    Had nothing to do with that the mural was a depiction of say organized labor over the years?

GOV. LEPAGE:    No.  None at all.  I come up through organized labor through my whole life, and so I have no problem with a hard working person.  But when you work for an honest day's pay for an honest day's work, you cannot rob money to pay for something that you want to see - - otherwise you just take it out of your pocket and pay for it.

PRSAMF ¶ 134, Attach. 1 *Tr. of Brian Williams Sept. 28, 2011 Interview of Gov.*

*Paul LePage*; DRPRSAMF ¶ 134.

On October 12, 2011, Jon Chrisos, a local Fox 23 newscaster, interviewed

Governor LePage about the mural:

JON CHRISOS INTRODUCTION:    An exclusive now – One on one with Governor Paul LePage.  It is his first sit-down interview with any Portland TV station since his inauguration.  The Republican Governor and I had a candid conversation about everything from that Labor Mural to his mission in Augusta and family life at the Blaine House.

…………..

JON CHRISOS:    Since January I think it's fair to say that people have seen a lot of you in the media.  Do you think you've been represented fairly by reporters?

GOV. LEPAGE:    I don't look at it, I I – quite frankly I look at the press as irrelevant in my case.  I'm not here for a popularity contest.  I worked hard to get here.  I work hard every day.  The press sells newspapers and I have a State to run, so I find them irrelevant and

50

I'm going to continue doing what I do best, and that's turn the State around.

JON CHRISOS:     Anything you wish you'd said differently?

GOV. LEPAGE:     I might have reworded a few things but quite frankly, it is what it is.  I'm not politically correct, don't intend to be, and I like to be blunt.

JON CHRISOS:     I know you've called this a distraction so let's get this out of the way.  The Labor Mural, did you think that it would blow up to be such an issue that it became?

GOV. LEPAGE:     I don't know.  I never thought about it and it's irrelevant in my mind.  The Mural can go right back up tomorrow if they pay the money that was used from the unemployment funds.  If the money is paid back, they can put it any place they want, any time they want.  But they took money from funds that were not appropriate.

JON CHRISOS:     So you had it taken down – money or the message of the mural, or some of both?

GOV. LEPAGE:     The message – I don't have a message – a bad message about the Mural, in matter of fact I'm very, very compassionate and I feel passion for the Labor Unions.  I think Unions – Union members have never been a problem in my mind.  Union bosses are.  Union bosses are – take advantage of people, and they collect all this money and they put it in political campaigns instead of putting it into the product that they give us to work with, and to me, if they put as much emphasis on the quality of employee that they hire, I think we'd have a perfect utopia.

JON CHRISOS:     So you've been accused of being anti-Union but from the answer you just gave, it sounds like you're not?

GOV. LEPAGE:     No, I'm not anti-Union at all. My family and my wife's family all grew up through the Union ranks and there's nothing wrong with that.  It's, uh, I have a real problem with the power that Union bosses have nationally and they sell their membership a bill of goods.

PRSAMF ¶ 135; DRPRSAMF ¶ 135.

### 22. Governor LePage's Press Release

After the Brian Williams interview, Adrienne Bennett issued the following press release:

> The Administration originally removed the mural because of its messaging. The mural portrays only one party that the [MDOL] serves—workers not job creators. In order to change the culture the decision was made to find a more appropriate location for the mural. It was then discovered how the mural was funded and that these funds could have been put into the Unemployment Trust Fund for Mainers to benefit from. When the Governor learned of this it further supported the decision.

> The Governor took part in this panel discussion to speak about education; however, it is clear that NBC had an entirely different agenda for Governor LePage. With limited time to answer the question the Governor chose to speak about the most disturbing aspect—that this money could have been put into the Unemployment Trust Fund rather than used on a mural. This information was under reported by media this spring.

DAF ¶ 134A.

## II. THE PARTIES' POSITIONS

### A. The State Defendants' Position

#### 1. The First Amendment Claim

The State Defendants contend that the Plaintiffs' First Amendment claim has been "resolved by this Court's April 22, 2011, order denying the motion for a temporary restraining order." *State's Mot.* at 6. The State Defendants explore the factual underpinnings of the Order and argue that the additional facts contained in the motion for summary judgment sustain and buttress the Court's April 22, 2011 conclusions. *Id.* at 6-11. Regarding the question of government exclusion, the State

Defendants view the "Call for Artists" and the "Public Art Notification" as "clearly demonstrat[ing] that the State controlled the viewpoint of the mural." *Id.* at 10.

Turning specifically to the Plaintiffs' First Amendment arguments, the State Defendants argue that the Plaintiffs cannot stand in Ms. Taylor's shoes for purposes of her First Amendment claims, especially because whatever such claims she retained are a function of her contract with the State and thus limited to the remedies provided therein. *Id.* at 11-12. The State Defendants also disagree with the Plaintiffs that in *Summum*, the Supreme Court adopted an "unmistakably signifying" or "reasonable observer" standard for determining whether the government speech doctrine applies. *Id.* at 12-13 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 474 (2009)). Furthermore, they contend that the Plaintiffs' position would "benefit from a dose of common sense." *Id.* at 13. They note that the public elects a new political leader because of the message she conveys about previous state policy and the public "expect[s] the speech—the message—from the government to change. That is exactly why she was elected." *Id.* at 13. They say that the "Plaintiffs' view of the Constitution would fossilize the message—the speech—of prior government leaders into some sort of unalterable grail." *Id.*

### 2.  The Due Process Claim

The State Defendants assert that the Plaintiffs' procedural due process claim must fail because they have no rights or liberties upon which to base such a claim. *Id.* at 13-14.

### 3.     The State Law Claims

Finally, they maintain that the Plaintiffs' state law claims should be dismissed for a variety of reasons.  *Id.* at 14-17.  First, they claim that once the federal causes of action are dismissed, the Court should not reach the state law claims.  *Id.* at 14.  Second, turning to Count III, breach of fiduciary duty by Director Phillips, the State Defendants argue that Mr. Phillips has no legal duty to display any particular work of art and no fiduciary duty over a work of contemporary art that depicts historical events.  *Id.* at 14-15.  Regarding Count IV, the Rule 80C count, the State Defendants argue that this cause of action is unsupported by law and so should be dismissed.  *Id.* at 16.

### B.     The Plaintiffs' Response

### 1.     The First Amendment Claim

Quoting Justice Souter's concurrence in *Summum*, the Plaintiffs contend that the government speech doctrine should not apply because "the character of the speech at issue and its governmental nature has not been made clear" and therefore the "government should lose." *Pls.' Opp'n* at 3 (quoting *Summum*, 555 U.S. at 485). They say that the State Defendants have failed to demonstrate that the State exercised "a high degree of control over the message conveyed by the mural." *Id.* at 3; *see id.* at 4-7.  They point out that the mural's subject matter and theme originated with Charles Scontras, not the State, and that other than contributing to her selection as artist, the State did not effectively control the message and viewpoint Judy Taylor expressed in the mural.  *Id.* at 5-14.  Furthermore, they

contend that the State Defendants have "failed to demonstrate that observers routinely and reasonably would understand that the mural was an expression of the State's rather than [Ms.] Taylor's message, particularly given the location and surroundings of the mural, the nature of public art in Maine, and the widespread placement of privately created art in government buildings throughout Maine." *Id.* at 3; *see id.* at 14-22.  They urge the Court to conclude that these questions raise triable issues.  *Id.* at 3.

### 2.    The Due Process Claim

Taking the obverse of the State Defendants' argument, the Plaintiffs contend that because they have a First Amendment right, they also have a "claim of deprivation of procedural due process . . . premised on [the] deprivation of a constitutionally-cognizable right."  *Id.* at 22.

### 3.    The State Law Claims

The Plaintiffs say that if the federal claims survive summary disposition, the Court would have ongoing jurisdiction over the state law claims, but they concede that if the Court grants summary judgment as to the federal claims, it need not exercise jurisdiction over the pendent state law claims.  *Id.* at 22.  Assuming the Court retains jurisdiction, they urge the Court not to accept Deputy Director McDonald's statement that the provisions of 27 M.R.S. § 81 and 27 M.R.S. § 86-A do not apply to contemporary works of art depicting historical events because that interpretation is contrary to the language of the statute and not otherwise entitled to deference.  *Id.*  at 22-23.   The Plaintiffs further argue that the 80-C claim should

stand because the State Defendants failed to follow "well-established Maine law concerning the required process for removing . . . work in the Museum's possession and responsibility." *Id.* at 24-25.

### C.      The State Defendants' Reply

Noting that the Plaintiffs claim a First Amendment right to view the mural, the State Defendants say that, even assuming they have such a right, the mural can now be viewed online and, but for this lawsuit, the mural could be viewed at another location in Maine where it would be more accessible to the public. *State's Reply* at 1-2. Secondly, the State Defendants reject the Plaintiffs' attempt to demonstrate that the mural is not government speech, arguing that "[t]here is no dispute that the [MDOL] conceptualized, commissioned, inspected, paid for, accepted, owns, had the right to terminate and change the mural, and has the right to relocate and even destroy the mural." *Id.* at 2. The State Defendants also reject the Plaintiffs' viewpoint argument, contending that the opinions of two Maine artists about works of art and the government speech doctrine do not create an issue of fact. *Id.* at 7-9. In addition, the State Defendants question whether the Plaintiffs have produced a "willing speaker" to trigger the application of the First Amendment. *Id.* at 9-10. Finally, they reassert that the Plaintiffs' state law claims are meritless. *Id.* at 11-12.

### D.      Plaintiffs' Supplemental Brief

After the Court granted the Plaintiffs' Motion to Reopen the Record to include Governor LePage's interviews with Brian Williams and Jon Chrisos, the Plaintiffs

56

were permitted to file a supplemental written argument concerning the significance of the interviews. *Pls.' Supplemental Opp'n* at 1-7. The Plaintiffs argued that Governor LePage's statements undercut the State Defendants' premise that the State removed the mural for reasons related to its message. *Id.* at 5. Instead, the Plaintiffs says that Governor LePage's statements at least raise a factual question as to whether the State was intending to convey any message at all in removing the mural and therefore the removal has nothing to do with the government speech doctrine. *Id.* at 6-7.

### E.     The State Defendants' Supplemental Response

In response, the State Defendants said that the government speech doctrine does not require that state officials "always speak consistently and . . . accurately." *State Defs.' Supplemental Resp.* at 1. They argued that the "specter of political lawsuits and trials pursued by those *out of power* every time those *in power* make arguably inconsistent or inaccurate statements is not one embraced by the Constitution." *Id.* (emphasis in original). The State Defendants claimed that the Plaintiffs "purposely focused the litigation on political issues" and that the Governor's more recent statements simply reflect his administration's "having moved on, past the political firestorm surrounding the mural, to focus on other more important matters, including fiscal integrity." *Id.* at 2. They observed that "[t]here is no requirement that the government's message at the time the mural was originated be the same as it was when it was removed, or that either be the same as the message for the mural's continuing not to be shown." *Id.* at 4. In short, the

57

question, according to the State Defendants, is "whose message is it." *Id.* at 5. Finally, the State Defendants responded that there is "nothing mandating that the message or reason must be singular, clear or consistent or cannot evolve." *Id.* at 6.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London.*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). An issue is genuine if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas*, 637 F.3d at 56 (quoting *McCarthy*, 56 F.3d at 315).

Once this evidence is supplied by the moving party, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary

weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002).

## IV.  DISCUSSION

### A.  The Temporary Restraining Order

The Court does not start from scratch.  On April 22, 2011, the Court issued an extensive order, concluding that the State's actions represented a permissible form of government speech.  *TRO Order* at 1-45.  The question is whether the law and the facts in this motion merit a different result.  The Court concludes that they do not.  As part of its Order on this motion, the Court therefore adopts in its entirety its April 22, 2011 Order denying the Plaintiffs' Motion for TRO.

There are, however, some procedural differences between the Plaintiffs' Motion for TRO and the State Defendants' Motion for Summary Judgment.  In the Motion for TRO, the burden rested on the Plaintiffs; in the Motion for Summary Judgment, the burden rests on the State Defendants.  *Compare Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006), *with* Fed. R. Civ. P. 56(a).  Furthermore, as just noted, in a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-movants, in this case the Plaintiffs.

Whether by motion for TRO or summary judgment, though, the legal issue is the same—whether the Plaintiffs are entitled to the injunctive relief they demand. The First Circuit has described injunctive relief as an "extraordinary and drastic remedy." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). Here, in addition to damages and declaratory relief, the Plaintiffs seek injunctive relief in the form of a court order requiring the State Defendants to: (1) reveal the location of the mural; (2) instruct the person in possession of the mural to preserve and protect it; (3) return the mural to its permanent location at the MDOL and thereafter preserve and protect it; and (4) refrain from any further action with respect to the place of display of the mural.[48]  *Third Am. Compl.* at 13-15.

### B.   Standing

In its Order denying the TRO, the Court touched on standing. *TRO Order* at 13-14. "The doctrine of constitutional standing reflects the fundamental limitation of judicial power to 'Cases' and 'Controversies' under Article III of the Constitution." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (internal citation omitted).  An actual case or controversy exists when the party invoking federal jurisdiction has a "personal stake" in the outcome of the asserted claim. *Katz v. Pershing, LLC*, No. 11-1983, 2012 U.S. App. LEXIS 4024, at *7 (1st Cir. Feb. 28,

---

[48] In their opposition, the Plaintiffs clarified that they are not actually seeking the permanent placement of the mural at the MDOL anteroom.  *Pls.' Opp'n* at 21-22.  Instead, they seek an order returning the mural to the anteroom subject to removal for non-political reasons.  *Id.*  The Court accepts the Plaintiffs' limitation on their requested relief.

2012).  "To satisfy the personal stake requirement, a plaintiff must establish each part of a familiar triad: injury, causation, and redressability."  *Id.*

The Court is doubtful that any of the Plaintiffs have met the "injury-in-fact" requisite of this "irreducible constitutional minimum" for standing.  *Sutliffe*, 584 F.3d at 325.  "Injury in fact is an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal punctuation omitted).  Whether the Plaintiffs are suffering an injury sufficient to convey standing is entangled with whether they have a First Amendment right to view the mural.[49]

The Plaintiffs say they frequented the MDOL offices, drew inspiration from the mural, and planned to view it on future visits to the MDOL.  It has long been recognized that where a speaker exists for First Amendment purposes, "the protection afforded is to the communication, to its source and to its recipients both."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57 (1976).  The Supreme Court thus instructs that there exists "a First Amendment right to 'receive information and ideas,' and that freedom of speech 'necessarily protects the right to receive.'"  *Id.* (quoting *Kleindienst v. Mandel,* 408 U.S. 753, 762-63 (1972)).  This "reciprocal right to receive" the protected expression—here the mural—then "may be asserted" by the Plaintiffs as potential

---

[49] To the extent that the Plaintiffs assert a violation of Ms. Taylor's contract with the state of Maine, they have no standing.

recipients.  *Id.* at 757.  More recently, as noted in the TRO Order, the First Circuit, in addressing a government speech issue, observed that "the dispositive questions of standing and statement of a cognizable claim are difficult to disentangle," and in *Griswold v. Driscoll*, 616 F.3d 53 (1st Cir. 2010), the First Circuit decided to "dispose of both standing and merits issues together."  616 F.3d at 56.  The Court follows the First Circuit's lead and proceeds to the substantive analysis.

This is not without misgivings.  Even though there is a relaxed standard for standing in First Amendment cases, this "does not mean that plaintiffs can dispense with the need to meet core Article III standing principles."  *Sullivan v. City of Augusta*, 511 F.3d 16, 26 (1st Cir. 2007).  In *Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464 (1982), the Supreme Court wrote that "[t]he federal courts have abjured appeals to their authority which would convert the judicial process into no more than a vehicle for the vindication of the value interests of concerned bystanders."  454 U.S. at 473 (internal punctuation and citation omitted).

Despite the inspiration the Plaintiffs have drawn from the mural, the Court is doubtful that its removal is a sufficient "injury in fact" to a member of the public to force the State to continue to display it—any more than a member of the public who enjoys a particular exhibit on display at the state of Maine Museum of Art would have standing to force the museum to make it permanent.  In fact, the Plaintiffs concede that "[t]he State remains free to remove the mural, and other pieces of private artwork in public buildings, for any number of legitimate reasons,

62

so long as that removal is not a viewpoint-based suppression of private speech in violation of the First Amendment." *Pls.' Opp'n* at 22. Thus, the Plaintiffs seem to acknowledge that a generalized right to view the mural is not sufficient to accord them standing to challenge the State's disposition of its artwork so long as the State's removal is not content-based.

The Plaintiffs' more restrictive claimed right—to view the mural only if the State removed the mural because of its content—must be further refined, because there is no suggestion from the Plaintiffs that the Governor could not have removed the mural for another content-based yet non-political reason, such as disliking its color scheme. More precisely, the Plaintiffs argue that Governor LePage could not constitutionally remove the mural from the anteroom because he disagreed with its political message.[50] Thus winnowed, the Plaintiffs' purported constitutional right to view the mural is a right contingent upon the Government's reason for its removal, rather than the mural itself. The Court is skeptical that the Plaintiffs have standing to assert a constitutional right to view that depends not upon the message of the mural but upon the motivations of the Government.

This case may be an outlier based on a peculiar set of facts, but the Court's concern is for the next case. Works of art typically convey some type of message, which, if the work were removed, could generate a claim that the removal was content-based. If members of the public have standing to claim a constitutional

---

[50] One potential danger of the Plaintiffs' position is that a future governor could remove a work of art for purely political reasons and say he is removing it for non-political ones. If that is to be the lesson to state officials, this case will have the unintended consequence of encouraging state officials to dissemble.

violation because they enjoyed the message of a removed work of art and if they believe the State removed it because of its political message, the courts run the risk of becoming a battlefield for the airing and disposition of purely political grievances. At the same time, the courts must not be closed to those who wish to present legitimate free speech concerns.   Under the current First Circuit directive in *Griswold*, the trial court treats the standing and merits issues as interwoven and therefore reaches the merits, despite its unease.   The concept of standing in government speech cases may deserve a closer look.

### C.   The First Amendment Claim

#### 1.   The Governor's Act and the Free Speech Clause

Most people take it for granted that the Governor of the state of Maine has a right to speak his mind.  An attempt by a disgruntled group of citizens to muzzle the Governor's oral or written political speech would likely be seen as odd and meritless.  As a constitutional matter, the right to speak extends to the right not to be forced to adopt someone else's speech. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind'") (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943)); *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962 (1st Cir. 1993) ("[t]he First Amendment protects the right not to speak or associate, as well as the right to speak and associate freely").[51]  Thus, if a group of private citizens were to seek to

---

[51] The Court is aware that in discussing this point, it is mixing government speech apples with Free Speech oranges: applying principles derived from private citizens' First

compel a sitting governor to read a speech written by a former governor, such an effort would seem quixotic at best.

In this case, the parties agree and the Court takes as a given that the labor mural projects a message and that that message is speech. Once the labor mural's message is seen as a message conveyed by the MDOL, the Governor has the right not to be forced to convey to the visiting public an MDOL viewpoint that his administration rejects. The Governor has as much right not to project a message about the history of Maine labor in a state-owned mural as he would to decline to read aloud a history of labor in Maine written by the prior administration.

In other words, as the Supreme Court has held, a government entity has the right to "speak for itself." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229 (2000)). The state's elected representatives have a right to speak on matters of government: to say what they want to say and to refuse to say what others want them to say. That this mural is a work of art likely makes it more difficult for some to understand why an elected official should be allowed to shut it away. But if the work of art carries—as many do—a powerful, evocative, and persuasive message, it

---

Amendment challenges to the Governor's right to government speech, which—as *Summum* taught—would not be "subject to scrutiny under the Free Speech Clause." *Summum*, 555 U.S. at 464. However, the government speech doctrine is still nascent. As it is further defined, the courts may well borrow from existing First Amendment jurisprudence. For example, some basic First Amendment principles, such as the rule against compelled speech, are likely to find their way into government speech. Similarly, First Amendment Establishment Clause rules still apply. *See Summum*, 555 U.S. at 469 ("government speech must comport with the Establishment Clause"); *id.* at 485 (Souter, J., concurring) ("[t]he interaction between the 'government speech doctrine' and Establishment Clause principles has not . . . begun to be worked out.").

is as much speech as an oral statement and, like an oral statement, cannot be forced upon others, including the Governor.

The Plaintiffs concede that the mural is speech but they argue that the mural has been and remains not government speech, but the artist's speech. "In the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector*, 515 U.S. 819, 828 (1995). However, "[t]he Free Speech Clause . . . does not regulate government speech. A government entity . . . is entitled to say what it wishes, and to select the views that it wants to express." *Summum*, 555 U.S. at 467 (internal citations and punctuation omitted). The question thus narrows to whether the mural's removal was government or private speech.

### 2.   The Evolution of the Government Speech Doctrine

In *Johanns v. Livestock Mktg. Ass'n*, 554 U.S. 550 (2005), the Supreme Court held that when "the government sets the overall message to be communicated and approves every word," the expression is government speech. 554 U.S. at 562. The inquiry is more complicated when the message is not the Government's "from beginning to end," *id.* at 560-61, but a government "is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Id.* at 562. Under *Johanns*, the degree of governmental control over the message controls the analysis.

Since *Johanns*, the Supreme Court has developed the government speech doctrine further. In its Order on the motion for TRO, the Court described the

66

United States Supreme Court decision in *Summum*.   *TRO Order* at 16-19.   To set the stage, the Court abbreviates that analysis here.

      a.       ***Pleasant Grove City, Utah v. Summum***

In *Summum*, the United States Supreme Court considered whether a municipality violated the First Amendment when it prohibited a private group from placing a permanent monument in a city park where other donated monuments had been erected. 555 U.S. at 464.   The Summum, a private religious organization, requested permission to erect a stone monument containing "the Seven Aphorisms of SUMMUM" in a Pleasant Grove, Utah public park.   *Id.* at 465.   The city denied its request.   *Id.*   Pleasant Grove had previously accepted a monument of the Ten Commandments in the same park, and Summum alleged that the city "violated the Free Speech Clause of the First Amendment by accepting the Ten Commandments monument but rejecting the proposed Seven Aphorisms monument."   *Id.* at 466.

Observing that the parties fundamentally disagreed about whether the city was engaging in its own expressive conduct or was providing a forum for private speech, the Supreme Court concluded that "the placement of a permanent monument in a public park is best viewed as a form of government speech not subject to scrutiny under the Free Speech Clause."   *Id.* at 464.   It articulated the principle that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."   *Id.* at 467.   The Court examined the policies underlying this principle.   *Id.* at 467-68.   It explained that the government would be unable to function if "every citizen were to have a right to

insist that no one paid by public funds express a view with which he disagreed." *Id.*
at 468.  If that were the case, all political debate would be relegated to the private
sector. *Id.*

The *Summum* Court did not set forth a specific analysis to determine
whether expression is government or private speech, but it hinted at certain
relevant factors.   First, it observed that "[n]either the Court of Appeals nor
respondent disputes the obvious proposition that a monument that is commissioned
and financed by a government body for placement on public land constitutes
government speech." *Id.* at 470.  The Court also added the concept of permanency.
*Id.* ("[p]ermanent monuments displayed on public property typically represent
government speech").  Second, it noted that government speech does not become
private speech merely because it "receives assistance from private sources for the
purpose of delivering a government-controlled message." *Id.* at 468.   Third, it
suggested that the government's involvement in commissioning the work and in
how the work came to be in public space matters.  Explaining why monuments on
public property are typically public speech, the Court stated that "[w]hen a
government entity arranges for the construction of a monument, it does so because
it wishes to convey some thought or instill some feeling in those who see the
structure." *Id.* at 470.  Fourth, the Supreme Court indicated that the location of the
work is important because it is "not common for property owners to open up their
property for the installation of permanent monuments that convey a message with
which they do not wish to be associated." *Id.* at 471.  Fifth, a government's ability

to reject works is a hallmark of government speech. *Id.* at 472-73 ("Respondent does not claim that the City ever opened up the Park for the placement of whatever permanent monuments might be offered by private donors. Rather, the City has 'effectively controlled' the messages sent by the monument in the Park by exercising 'final approval authority' over their selection"). Finally, the size of the venue where the work is displayed is a relevant consideration. *Id.* at 478-79 ("public parks can accommodate only a limited number of permanent monuments . . . . [I]t is hard to imagine how a public park could be opened up for the installation of permanent monuments by every person or group wishing to engage in that form or expression"). Taken together, these considerations suggest that the government's control over speech is the predominant consideration in the government speech analysis. *See also Sutliffe*, 584 F.3d at 329 ("plaintiffs' claim fails because the Town defendants' actions, in setting up and controlling a town website and choosing not to allow the hyperlinks constituted government speech").

### b. Applying *Summum*

Here, as in *Summum*, the Court is dealing with several tiers and timeframes of speech. The State spoke when the MDOL solicited a specific message in its "Call for Artists." The artist spoke when she proposed her mural to the MDOL. The MDOL spoke when it commissioned her work. The artist spoke when she created her mural, choosing some images and themes over others. The MDOL spoke again when it accepted Ms. Taylor's mural and hung it in its anteroom. Finally, Governor LePage spoke when he ordered the removal of the mural and its message. It is this

69

final speech—the taking down of the mural—that the Plaintiffs contest.  Putting-up and taking-down the mural, however, are two sides of the same coin.  Thus, before turning to that final act of expression, Governor LePage's removal of the mural, the Court addresses the Plaintiffs' argument that the mural itself is the artist's private speech.

In *Summum*, the Supreme Court emphasized a number of factors, including whether the proposed speech is a (1) permanent, (2) publicly-financed (3) monument, (4) that is displayed (5) on public property.  *See* 555 U.S. at 485.  A straightforward application of the *Summum* factors to this case compels the conclusion that the mural is government speech.  The mural is a permanent (by contract), publicly-financed (through state and federal funding), artistic work (like a monument), which was displayed (hung on the wall) on public property (the MDOL offices).  In the words of the Supreme Court, it is an "obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech."  *Id.* at 470.  In fact, taking each of the factors separately, the case for the mural here being government speech is more compelling than were the monument facts in *Summum*.

### i.  Permanent

Clause fifteen of the contract provided that "[t]he permanent location of the work shall be: Department of Labor, Augusta, Maine."  PRSAMF ¶¶ 48-58; DRPRSAMF ¶¶ 48-58.  If the Plaintiffs were to prevail, the mural would be

permanently located in the MDOL anteroom, subject only to removal for reasons unrelated to its political message.

### ii.    Publicly Financed

In *Summum*, despite the monument being privately financed, the Supreme Court concluded that if placed in the public park, it would be government speech. *Id.* at 470-71.   Here, the funding for the mural was derived exclusively from governmental sources.   *Stip.* ¶ 45 ("The contract was paid for by 10 different streams of funding, through the Reed Act, the Bureau of Labor Standards, the Bureau of Rehabilitation Services, the Center for Workforce Research and Information, and the Commissioner's Office – MDOL overhead").

### iii.    Monument

Although *Summum* addressed a monument in a public park, its rationale extends to other types of works of art, such as this mural. *See TRO Order* at 20-21. With the Motion for Summary Judgment, the parties placed into the record photographs of the mural as it appeared in the MDOL anteroom. *Stip.* Ex 10A-I. From the Court's perspective, the mural overshadows the room.  The anteroom is a 12 foot by 26 foot rectangular space.  *Stip.* ¶ 63.  From the photographs, the anteroom has a chair rail and each panel of the mural begins at the top of that chair rail and extends up the wall to the ceiling.  *Stip.* Ex 10A-I.  Panels one through four cover an entire 12 foot wall space; panels five through ten cover an entire 26-foot wall space up to a door and the eleventh panel is on the other side of the door.  *Id.*

The parties have not placed photographs of the rest of the room before the Court. However, the mural—by any objective view—dominates the room.

The relevance of the mural's impact on the anteroom is the *Summum* Court's concern that "public parks can accommodate only a limited number of permanent monuments." 555 U.S. at 478-79. The Supreme Court contrasted speeches with permanent monuments:

> Speakers, no matter how long-winded, eventually come to the end of their remarks; persons distributing leaflets and carrying signs at some point tire and go home; monuments, however, endure. They monopolize the use of the land on which they stand and interfere permanently with other uses of public space.

*Id.* at 479. In this case, it is beyond argument that the mural substantially monopolizes the wall space in the MDOL anteroom.

### iv.    Displayed

The mural has been displayed in the MDOL anteroom since August 2008 and, if the Plaintiffs were successful, would remain displayed there for the foreseeable future.

### v.    On Public Property

Although in leased office space, the mural was displayed in the anteroom of the MDOL state offices in Augusta. While not as open as a public park, the anteroom is "the place where visitors to MDOL typically wait for their meeting, or for the person they are visiting to come and get them." *Stip.* ¶ 12. There has been no contention that the mural was not located on public property.

72

### c.    Under *Summum*, the MDOL Mural is Government Speech

Based on the summary judgment record, the mural (and its placement in a government office) meets each of the *Summum* criteria for government speech.[52]  As this Court remarked in its TRO, "[t]aken together, these considerations suggest that the government's control over speech is the predominant consideration in the government speech analysis."   *TRO Order*, 789 F. Supp. 2d at 181; *see also Summum*, 555 U.S. at 473 ("the City has "'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection"); *Johanns*, 544 U.S. at 560 ("[t]he message of the promotional campaigns is effectively controlled by the Federal Government itself").

The mural clearly meets this more general criterion of government speech—the "effective control" by the government of the message.   Here, the MDOL controlled the message set forth by Judy Taylor in the commissioned mural: it solicited submissions, set the overall theme, suggested ideas, provided an expert historian, tracked the artist's progress, paid for the mural, exercised final approval authority, took ownership, retained many important ownership rights including the right of destruction, and eventually displayed the mural in its open-to-the-public office, even providing in the anteroom pamphlets explaining the mural's panels.

Further, from a policy standpoint, the *Summum* Court reasoned that government would be unable to function if "every citizen were to have a right to

---

[52] In its order denying the TRO, the Court rejected the Plaintiffs' original contention that Justice Alito's "unmistakably signifying" language is the legal test.  *TRO Order* at 33-34.  The Plaintiffs did not raise the Alito test in their opposition to the State Defendants' motion.  *Pls.' Opp'n* at 1-26.  To the extent the Plaintiffs maintain their position, the Court maintains its response.

insist that no one paid by public funds express a view with which he disagreed." 555 U.S. at 468. Here, some private citizens disagree with the view expressed by the Governor in ordering the mural's removal. The prospect of haling a sitting governor into federal court to be cross-examined under oath as to why he made a political decision may momentarily cheer the partisan. But the long-term implications of federal court intervention in state politics are sobering.

### 3.    The Post-*Summum* Landscape

As the First Circuit has observed, "the [government speech] doctrine is still at an adolescent stage of imprecision." *Griswold*, 616 F.3d at 59 n.6. As the doctrine is young and no strict test has yet been set forth by the Supreme Court, lower courts and litigants look elsewhere for guidance.

### a.    The First Circuit and the Government Speech Doctrine

Post-*Summum*, the First Circuit has had few opportunities to apply the government speech doctrine in First Amendment challenges. In *Sutliffe v. Epping*, 584 F.3d 314 (1st Cir. 2009), the First Circuit held that a town's actions in setting up and controlling a town website and refusing to add a hyperlink to a private group's website constituted government speech. 584 F.3d at 329. Citing *Summum*, the First Circuit explained that "when the government uses its discretion to select between the speech of third parties for presentation through communication channels owned by the government and used in government speech, this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech." *Id.* at 330. Again, the effective control

74

exercised by the government was a factor.  *Id.* at 331 ("like the city in *Summum*, the Town defendants effectively controlled the content of this message by exercising 'final approval authority over the selection of the hyperlinks on the website'").

Like the act of removing a mural, the government speech in *Sutliffe* manifested as a somewhat unconventional form of expressive activity.  The town, "by choosing only certain hyperlinks to place on [its] website, communicated an important message about itself"—"even more directly than did the city in *Summum*."  *Id.* at 331.  According to the First Circuit, this "expressive activity"— the choosing of hyperlinks—"was independent of the specific content of the websites that were hyperlinked."  *Id.*  Likewise, here the expressive activity of hanging the mural—and conversely the expressive activity of removing the mural—was independent of the specific content of the mural itself.

The *Sutliffe* Court further recognized that the government speech doctrine does not leave the government free of all restraints.  It noted that "[i]f the voters do not like those in governance or their government speech, they may vote them out of office or limit the conduct of those officials 'by law, regulation, or practice.'"  *Id.* at 332 n.9 (citing *Southworth*, 529 U.S. at 235 and quoting *Summum*, 555 U.S. 468).

### b.    Hybrid or Mixed Speech

Both before and after *Summum* and *Johanns*, lower courts have grappled with distinguishing government speech from private speech.  The Fourth Circuit, pre-*Johanns* and -*Summum*, developed a four-factor test to help determine the

character of speech.[53]   Under *Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002), a court considers the so-called *SCV* factors:

    (1) the central purpose of the program in which the speech in question occurs;

    (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech;

    (3) the identity of the "literal speaker"; and

    (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech.

*Turner v. City Council of the City of Fredericksburg, Va.*, 534 F.3d 352 (4th Cir. 2008) (quoting *Sons of Confederate Veterans*, 288 F.3d at 618).

These *SCV* factors led the Fourth Circuit to carve out a third category of speech that is neither wholly governmental nor wholly private.  *See Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786 (4th Cir. 2004).  This mixed speech—dubbed hybrid speech—combines aspects of both government and private speech and has been adopted by several courts outside the First Circuit.  *See W. Va. Ass'n of Club Owners and Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("some speech is 'mixed' speech because it has aspects of both private speech and government speech"); *Sons of Confederate Veterans*, 305 F.3d at 245 (some speech is "neither exclusively that of the private individual nor exclusively that of the government, but, rather, hybrid speech of both"); *Grosjean v.*

---

[53] The Fourth Circuit borrowed these factors from other circuit courts.  *See Wells v. City and County of Denver*, 257 F.3d 1132, 1141 (10th Cir. 2001); *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2001); *Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.*, 203 F.3d 1085 (8th Cir. 1999).  The Eighth, Ninth, and Tenth Circuits have since joined the Fourth in adopting the four-factor *SCV* test to determine the character of possible government speech.  *See, e.g., Arizona Life Coal., Inc. v. Stanton*, 515 F.3d 956, 960 (9th Cir. 2008).

*Bommarito*, 302 Fed. Appx. 430, 436 (6th Cir. 2008) (the first question is whether the expression "consists of government speech, private speech, or some mix thereof"); *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, No. 2:06-cv-1064, 2008 WL 4965855, at *14 n.6 (W.D. Pa. 2008) ("[e]ven if the co-sponsored advertisements are not private speech, in the very least the analysis of the relevant factors indicates that they are a mixture of government and private speech").

The hybrid approach has the attraction of practicality because speech is often not readily pigeon-holed into either governmental or private expression and the hybrid concept recognizes the need to avoid oversimplification. Yet, the hybrid test risks resulting in the government's inability to speak whenever any degree of private speech is involved because the First Amendment protections that apply to the private speech component would invariably trump the governmental interest in its own speech.

This case illustrates the problem. In a case, like this one, involving a government-commissioned work of art, the initial or "literal" speaker may be the artist herself, but the work of art at issue may be a mixture of governmental and private speech. *See W. Va. Ass'n of Club Owners and Fraternal Servs.,* 553 F.3d 292; *Planned Parenthood of S.C.*, 361 F.3d 786; *ACLU of N.C. v. Conti*, No. 5:11-CV-470-F, 2011 U.S. Dist. LEXIS 141146 (D.N.C. Dec. 8, 2011). Yet, if a private artist retains a degree of First Amendment control over her artwork even after she sells it, the Government will be unable to control its own art.

This result is contrary to *Summum*, where the Supreme Court concluded that the Summum monument was government speech, even though it was created by a private artist. Similarly, in *Johanns*, where the Supreme Court addressed beef advertisements designed by an Operating Committee of the Beef Board that had governmental and non-governmental members, the Court deemed the Operating Committee's involvement "ancillary—it designs the promotional campaigns, which the Secretary supervises and approves—and its status as a state actor thus is not directly at issue." 544 U.S. at 560 n.4. If the monument in *Summum* and the promotional ads in *Johanns* were government speech despite the fact that they were created by private citizens, the fact that the mural in this case was created by a private artist does not make it private speech.

Here, the Court concludes that there is insufficient evidence in the record to establish that the mural's message was Ms. Taylor's—either in whole or in hybrid part—after it was installed in the MDOL anteroom. The record establishes that the idea for the commissioning of the mural began with the state of Maine, that Maine established its theme, that Maine commissioned its creation, that Maine chose the artist, that Maine paid for the mural, that Maine owns the mural, that Maine displays (or not) the mural on its own property, and that Maine even has the right to destroy it. The slight contractual strings that Ms. Taylor maintained in this work of art, such as the right to consultation before its destruction and the right to copyright, are insufficient to attach First Amendment rights to its display.

c.   **Back to** *Summum*:   **The Souter Concurrence—"A Reasonable and Fully Informed Observer"**

The Plaintiffs have another arrow in their quiver.  Although *Summum* was unanimous, six Justices wrote separate concurrences.   In his concurrence, Justice Souter proposed a test for determining whether speech is governmental:

> To avoid relying on a *per se* rule to say when speech is governmental, the best approach that occurs to me is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige by allowing the monument to be placed on public land.

*Id.* at 487 (Souter, J., concurring).  Focusing on the phrase, "a reasonable and fully informed observer," and what she "would understand," the Plaintiffs strenuously contend that in its context, the mural would be seen purely as the artist's speech.

The Court disagrees.  First, Justice Souter's test is not the Supreme Court's test.  Justice Souter's concurrence was his own and was not shared by any other Justice.  *Summum*, 555 U.S. at 486-87 (Souter, J., concurring).  Second, Justice Souter himself did not apply the "reasonable observer" test or some variation of the test when, in 2010, he wrote *Griswold* for the First Circuit.  *Griswold v. Driscoll*, 616 F.3d 53 (1st Cir. 2010).  At most, as the Court concluded in its TRO, what the "reasonable and fully informed observer" understands is one useful factor under the government speech test.[54]

Second, the "reasonable and fully informed observer" test has its own imprecision.  For example, the *Summum* majority mentioned government funding

---

[54] The reasonable observer test has the support of at least one judge in this Circuit.  Judge Torruella, in his dissent from *Sutliffe*, remarked, "In my view, the better course is to adopt the test proposed by Justice Souter in his concurrence in *Summum*."  584 F.3d at 338 n.16.

as a factor in determining whether the monument is government speech.  However, in this case, the casual visitor to the MDOL anteroom would not know the details of the funding sources.  It is unclear whether "fully informed" refers to a member of the general public viewing the work of art or a person knowledgeable about state-funded arts projects.[55]  Taken to its extreme, if "reasonable and fully informed observer" is a mixed question of law and fact, the test would compel a trial each time a dissident objected to the placement or removal of a work of art on public property.

Finally, even applying the "reasonable and fully informed observer" test, the Court is not convinced that there is a genuine issue of material fact as to whether such an observer would view this mural as anything other than government speech.  First, there is the mural's location.  The mural was not in the Maine State Museum, in an art exhibit in the Capitol rotunda, or even in a public park; it was in the anteroom of a state agency.  It would be difficult not to conclude that if the MDOL disagreed with the mural's message, it would not have placed the mural in its own room.  *See Summum*, 555 U.S. at 471 ("[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated").  Second, there is its theme.  It is no coincidence that a mural depicting the history of Maine labor was hung in the anteroom of the MDOL; the subject of the mural is generally consistent

---

[55] *See, e.g., Salazar v. Buono*, 130 S. Ct. 1803, 1810 (2010) (Alito, J. concurring) (explaining, in an Establishment Clause case, that the "so-called 'endorsement test' views a challenged religious display through the eyes of a hypothetical *reasonable observer aware of the history and all other pertinent facts relating to the display*") (emphasis added).

with the statutory mission of the MDOL.  Third, the accompanying plaque not only identifies Judy Taylor as the artist but also states that the mural was commissioned by the MDOL.  The reasonable and fully informed observer would likely conclude that the MDOL got what it commissioned and paid for, and that the mural represents its viewpoint.

### d.    Back to *Summum*:  The Breyer Concurrence—"Solely on Political Grounds"

The Plaintiffs have not yet exhausted their *Summum* arsenal and turn to Justice Breyer's separate concurrence.  In it, he wrote:

> Were Pleasant Grove City to discriminate in the selection of permanent monuments on grounds unrelated to the display's theme, say, solely on political grounds, its action might well violate the First Amendment.

*Summum*, 555 U.S. at 484 (Breyer, J., concurring).  Justice Breyer's view of a political speech carve-out to the government speech doctrine is echoed in some courts.  *See Bd. of Educ. v. Pico*, 457 U.S. 853, 870-71 (1982) ("[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books"); *Serra v. United States Gen. Servs. Admin.*, 847 F.2d 1045, 1050 (2d Cir. 1988) ("it is still possible that the Government's broad discretion to dispose of its property could be impermissibly exercised in an impermissibly partisan or political manner").  The Court acknowledges that if Justice Breyer's statement were the view of the majority

of the Supreme Court, the Plaintiffs would at least be entitled to a jury trial to determine the State Defendants' motivation in removing the mural.

However, as with Justice Souter's concurrence, Justice Breyer was not joined by any other Justice.  Moreover, the *Summum* majority characterized government speech as exempt—not partially exempt—from First Amendment scrutiny. *Summum*, 555 U.S. at 467 ("the Government's own speech . . . is exempt from First Amendment scrutiny") (quoting *Johanns*, 544 U.S. at 553); ("Government is not restrained by the First Amendment from controlling its own expression") (quoting *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 139 n.7 (1973)). According to *Summum*, the people are the final judges of the speech of their elected officials because the government is ultimately held "accountable to the electorate and the political process for its advocacy."  555 U.S. at 468 (quoting *Southworth*, 529 U.S. at 235).

Furthermore, there would be a high price for judicial examination of whether a statement by a government official was forbidden political speech, condoned government speech, or some partially permissible and partially impermissible middle ground.  Here, the Plaintiffs demand a trial in which it is likely that the current Governor of the state of Maine would be the prime witness.  This raises the specter of a sitting state governor being challenged under oath in federal court to defend his political decision in a case that has already demonstrated itself to be something of a political Rorshach test with opinions—pro and con—generally lining up along the partisan divide.

Moreover, there is evidence that the motivation behind the Governor's decision to remove the mural may have started with its content, moved to its funding, and is now some combination of the two.[56]  To hold a jury trial and subject elected officials to cross-examination whenever a dissident group contends that a governmental action, which affects a governmental message, is politically motivated would risk transforming the courts into stages for political theatre.  As Justice Souter once wrote in dissent, "[t]o govern, government has to say something, and a First Amendment heckler's veto of any forced contribution to raising the government's voice in the 'marketplace of ideas' would be out of the question." *Johanns*, 544 U.S. at 574 (Souter, J., dissenting).  The Court declines to apply the

---

[56] The Court briefly addresses the Plaintiffs' position on the Brian Williams and Jon Chrisos interviews of Governor LePage.  In their response, the Plaintiffs acknowledged the following:

> Plaintiffs do not seek to forever freeze the government message of a prior administration, nor do they seek an order that [Ms.] Taylor's mural be permanently displayed at the MDOL.  Instead, Plaintiffs merely challenge the State's <u>viewpoint-based</u> decision to remove [Ms.] Taylor's private expressive work.  The State remains free to remove the mural, and other pieces of private artwork in public buildings, for any number of legitimate reasons, so long as that removal is not a viewpoint-based suppression of private speech in violation of the First Amendment.

*Pls.' Opp'n* at 21-22.  During the Williams and Chrisos interviews, Governor LePage expressed a non-content-based rationale for removing the mural—namely, its funding sources.  As the Plaintiffs concede, if the Governor's fiscal rationale is accepted as the true motive behind the mural removal, there would be no First Amendment issue here because the removal is not related to content.  *See Pls. Mot. to Reopen* at 3 ("[i]f [Governor] LePage's statements are true, Defendants were not engaged in expressing the political views of the new administration which differed from those of the prior administration—the government speaking for itself").

From the Court's viewpoint, the Williams and Chrisos interviews add nothing to this motion.  If the Court accepts the contents of the interviews as revealing the real reason for the removal, the Plaintiffs themselves admit they have no First Amendment claim.   If the Court accepts the contents as revealing an additional motivation for removal, the claim becomes a hybrid claim.  If the Court declines to accept these statements because they contradict the content-based rationale the Governor first expressed, the Court returns to the starting point.  Under any of these choices, the result is the same.

political speech exception advocated by Justice Breyer to the government speech doctrine.

### 4.     Artists and Artistic Expression

The Plaintiffs' remaining First Amendment arguments concern the fact that the mural is an artistic expression: first, that the mural was Judy Taylor's own expression and thus her speech; and second, that other participants in state-run public art programs will refuse to contribute their own various forms of artistic expression for fear that these too would be deemed government speech.

### a.     The Artist's Role: Judy Taylor

In their opposition, the Plaintiffs earnestly press the point that the mural is Judy Taylor's artistic expression and therefore it must be considered her own private speech, not the Government's speech.   A primary problem with this contention is that the MDOL commissioned this work with a theme in mind; the Call for Artists read, in part:

> Above all, the value and dignity of workers, and their critical role in creating the wealth of the state and nation should be emphasized.

> Symbols such as archive photography, labor newspapers, labor advocacy and legislation should be referenced.   In essence, Maine workers should strongly be portrayed as more than an "impersonal cost of production."

DSMF ¶ 22A; PRDSMF ¶ 22A.  If the mural is seen merely as an artistic rendition of the Call for Artists, the speech, though artistically conveyed, is the speech of the State Government.  However, Ms. Taylor filed an affidavit in which she stated:

> No one on the committee told me what kind of content or message they wished the mural to convey; the only information with regard to the content of the mural was in the Call for Artists solicitation itself.  After

84

> I was invited to make the formal presentation in June 2007, I did not
> refer back to the solicitation, but developed all of the ideas and
> presentations on my own, based on my own research and my
> discussions with Charles Scontras, who had been identified in the Call
> for Artists as a labor historian who would be available for research
> assistance.

*Taylor Decl.* ¶ 14.  At this stage, the Court must and does accept the truth of Ms.

Taylor's statement.

But it views the statement as Ms. Taylor's declaration of artistic integrity

and independence.  In effect, the MDOL did not force Ms. Taylor just to color inside

the lines.  It did not tell her to include depictions of Frances Perkins, the Jay strike,

or Mr. Scontras nor did it tell her how to draw anyone.  But Ms. Taylor also

acknowledged in paragraph 13 that "[i]t was obvious to all that the mural would be

about the history of Maine labor."  *Id.* ¶ 13.  As it happens, the final product—the

mural itself—is entirely consistent with what the MDOL called for.  Further, Ms.

Taylor admits that she was originally guided by the Call for Artists solicitation and

that she made use of the state-suggested labor historian in developing her

presentation.  Ms. Taylor's declaration notwithstanding, the Court concludes that

the MDOL got the message it commissioned when Ms. Taylor delivered the mural.

### b.    The Effect on Other Artists

In their sworn declarations, Professors Christina Bechstein and Lauren

Fensterstock raise serious questions about the impact of a judicial decision in favor

of the State Defendants on the willingness of artists to participate in state-

sponsored art programs.  The professors predict disastrous consequences for

Maine's public art programs if artwork commissioned by the state of Maine is

deemed government speech. They say they personally will not participate in Maine-commissioned artwork and most artists would follow suit.

To allay (but not eliminate) their fears, the Court does not view this ruling as expansive. First, from the State Defendants' viewpoint, the state of Maine set about obtaining a work of art with a particular view about the history of labor in Maine, a view that championed labor to the neglect of management, and placed this work of art to dominate a small anteroom in a state agency that mediates labor-management issues. This type of work is dissimilar to the vast bulk of state-commissioned artwork, which has a purely artistic—not political—message and is placed in a school corridor or library. Thus, a sculpture carved under the Percent for Art program and placed in a school lobby would be an unlikely candidate for government speech protection.

Second, if the artist creates a work of art for the State that is perceived as a political message in favor of the ruling party, she runs the risk that once out-of-power political leaders assume power, they will view the work as an expression of rejected policies. Of course, the political world constantly turns and in time the rejected often become the elected. If artwork is stowed away, the returned leaders may well unpack it and restore it to its original place. *See Summum*, 555 U.S. at 468 ("[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position") (quoting *Southworth*, 529 U.S. at 235).

The political wisdom of focusing policy disputes on a work of art aside, the intense public focus on this mural unleashed a torrent of constitutionally protected

speech, educating the public on the history of Maine labor, the Maine roots of Frances Perkins, the first woman appointed to a United States Cabinet position, the proper sources of state funding for the arts, and the reach of First Amendment protections.  Whether Ms. Taylor intended the mural to convey a one-sided message is beside the point.  Once created, works of art take on a life of their own and typically stimulate responses—some anticipated by the artist, some not.  *See Summum*, 555 U.S. at 476 ("the thoughts or sentiments expressed by a government entity that accepts and displays . . . an object may be quite different from those of either its creator or its donor").  Although it is rare in this day and age for a work of art to become the center of a political storm, it is certainly not unusual in history and it is to their considerable credit that artists have not generally shied away from controversy.

Third, if the artists fear what will happen to their works once the State assumes ownership, they have the right to negotiate a contract that protects those interests.  Here, Ms. Taylor signed a contract that attached only the barest contractual strings to her mural once it was sold.  If Maine artists wish to protect their continuing rights to their work, they could negotiate a contract that recognizes and protects those rights.  *See Serra*, 847 F.2d at 1049 ("Serra relinquished his own speech rights in the sculpture when he voluntarily sold it to GSA; if he wished to retain some degree of control as to the duration and location for the display of his work, he had the opportunity to bargain for such rights in making the contract for sale of his work").  By the same measure, the state of Maine would have the right to

reject the artist's demand that she retain control over a work of art that she has sold to the state.  Of course, in this case, Ms. Taylor is not a party and has not attempted to enforce whatever contractual rights she may retain.

### 5.  Concluding Thoughts on the First Amendment Claim

The Plaintiffs claim that they are not seeking to "forever freeze the government message of a prior administration, nor do they seek an order that [Ms.] Taylor's mural be permanently displayed at the MDOL.  Instead, Plaintiffs merely challenge the State's <u>viewpoint-based</u> decision to remove [Ms.] Taylor's private expressive work."  *Pls.' Opp'n* at 21-22.  The Plaintiffs' argument lays bare an inherent contradiction: to force the current administration to replace the mural and to forbid its removal based on the message would in fact "freeze the government message of a prior administration."  What the Plaintiffs deny seeking is precisely what they seek.

Finally, the Court responds to Attorney Beal's impassioned and articulate statement during oral argument that the Court should not allow a constitutional right to be determined by the ballot box.  Mr. Beal properly said that our Constitution does not contemplate that the public will vote on whether torture is legal, a search is warranted, or First Amendment rights should be accorded.  Of course he is correct.

However well expressed, the point is largely rhetorical.  The question before the Court is not whether a constitutional right should be decided by the voters of the state of Maine; rather, it is whether there is a constitutional right to begin with.

88

Having concluded that the state of Maine engaged in government speech when it commissioned and displayed the labor mural, it follows that Governor LePage also engaged in government speech when he removed the mural. The Governor's message—whether verbal or in the form of the expressive act of removal—is government speech.

Once the Court concludes that removal of the mural is government speech, the Plaintiffs' First Amendment claim fails. Whatever the Governor's intended message in removing the mural from the MDOL anteroom, the Plaintiffs have no constitutional right to its continued presence there. The state, as a governmental entity, is entitled to say what it wishes and to select the views that it wants to express or does not want to express. *See Summum*, 555 U.S. at 467. The broader question as to the public policy implications of the Governor's actions and the resulting divided response is beyond this Court's ken and must be decided by the people of the state of Maine.

### D.   The Due Process Claim

In their response, the Plaintiffs acknowledge that their due process claim is contingent on the success of their First Amendment claim. *Pls.' Opp'n* at 22 ("Plaintiffs' Fourteenth Amendment Procedural Due Process claim is premised on the deprivation of Plaintiffs' First Amendment rights without due process of law"). Because the Court has determined there is no First Amendment violation, the Plaintiffs' due process claim must necessarily fail as well.

### E.    State Law Claims

With their constitutional claims, the Plaintiffs are also proceeding with two matters under state law, first alleging a violation of 27 M.R.S. § 86-A, which addresses the Maine State Museum's legal obligations regarding state-owned works of art, and second, seeking judicial review of the State's actions under the Maine Administrative Procedure Act, 5 M.R.S. § 11001 *et seq.*   The gravamen of these claims is that before moving the mural from the MDOL anteroom, the State Defendants were compelled to accord the Plaintiffs a statutory hearing.

However, these are purely state law claims that are before this Court pursuant to the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.   Where a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).   The First Circuit generally assumes that once all federal claims are resolved, the state claims should be dismissed.   *See, e.g., Batterman v. Leahy*, 544 F.3d 370, 376 (1st Cir. 2008) ("if the federal claims were disposed of on the papers, the district court would likely decline to exercise pendent jurisdiction over the state-law claims").   Accordingly, the Court dismisses, without prejudice, the Plaintiffs' state law claims.

## V.    CONCLUSION

The Court GRANTS the State Defendants' Motion for Summary Judgment on Counts I and II of the Plaintiffs' Third Amended Complaint and DISMISSES

WITHOUT PREJUDICE Count III and Count IV of the Plaintiffs' Third Amended

Complaint (Docket # 40).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 23rd day of March, 2012